**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 96-60031

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STANLEY HARRISON ASIBOR,

and

GANIU LADEJOBI,

Defendants-Appellants.

Appeal from the United States District Court
for the Southern District of Mississippi
(3:94-CR-129)

March 27, 1997

Before POLITZ, Chief Judge, WIENER, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Stanley Harrison Asibor ("Asibor") and Ganiu Ladejobi ("Ladejobi") (collectively referred to as "Appellants"), appeal their convictions for conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and illegal entry into the United States in violation of 8 U.S.C. § 1326 (b)(2). Ladejobi also appeals his conviction on two counts of possession with intent to distribute in violation of 21 U.S.C. § 841(a)(1). For the following reasons, we affirm.

**BACKGROUND FACTS**

In April of 1994, Wayne VanCleave ("VanCleave") and Sammy Pleasant ("Pleasant") were arrested in southwestern Louisiana, by local authorities, for possession of three kilograms ("kilos") of cocaine and a firearm. Subsequently, VanCleave and Pleasant traveled to Lake Charles, Louisiana and met with the local authorities regarding their cooperation in exchange for a lighter sentence. VanCleave and Pleasant were cooperative, but the local authorities discovered that they had no useful information. Thus, at the time VanCleave and Pleasant left Louisiana, no agreement had been reached. Nevertheless, the Louisiana authorities contacted the Drug Enforcement Administration ("DEA") in Jackson, Mississippi, and suggested that VanCleave and Pleasant might be useful informants.

On September 22, 1994, VanCleave and Pleasant were interviewed by two Jackson-based DEA agents, Steve Montachello and Joe Bond. With full knowledge that VanCleave had pled guilty to perjury in state court, the agents formed an agreement with VanCleave and Pleasant in return for their cooperation.[1] As a result of the cooperation agreement, DEA agents recorded two telephone conversations between VanCleave and Asibor. As a result of those conversations, VanCleave sent Jeffrey Dees to Houston to purchase two kilos of cocaine from Asibor. Upon Dees' return, VanCleave and Pleasant informed the DEA agents that only one kilo of cocaine had been purchased; however, in actuality, Dees had received two kilos of cocaine. The proceeds from the sale of the second kilo, $20,000, were hidden in Pleasant's house. Later, VanCleave and Pleasant admitted to

---

[1] The DEA employed special precautions and monitored the actions of VanCleave while he acted as a confidential informant for them.

purchasing two kilos of cocaine and distributing the second kilo; however, they claimed that the money had been stolen from its hiding place.

On October 21, 1994, during a meeting recorded by DEA agents, VanCleave purchased 29.7 grams of cocaine base (crack) from Ladejobi. Shortly after the meeting, it was discovered that the drug amount was "short." VanCleave telephoned Ladejobi who agreed to make up for the shortage and arranged a second meeting on the same day. The second meeting was also recorded. The two transactions on October 21 form the basis for Ladejobi's additional indictments for possession with the intent to distribute in violation of 21 U.S.C § 841(a)(1) and the resulting convictions.

On November 29, 1994, VanCleave traveled to Houston with DEA agents. He phoned Asibor and the two men agreed to meet at a playground. Asibor arrived on a bicycle and was arrested within minutes.[2] A few days later, Asibor was transported to Jackson, Mississippi.

At the time of Asibor's arrest, a search yielded a pager and a wallet with a Washington State driver's license in the name of Benjamin Quintana. After further investigation, DEA agents were able to discover Asibor's true identity and place of residence. Apparently, Asibor had been arrested in Jackson, Mississippi, in 1991 for possession of cocaine with intent to distribute.

On the following day, DEA agents went to Asibor's residence and spoke with Barbara Asibor, Asibor's wife. Mrs. Asibor acknowledged that Stanley Harrison Asibor was her husband and had been missing for 24 hours. She then signed a written consent form authorizing the agents to search the house. The search of the house yielded birth certificates in the name of Benjamin Quintana and

---

[2] Prior to the trip to Houston, Asibor had only been referred to as either "Al" or "Ol' boy." His real identity was unknown. Consequently, an arrest warrant had been issued by the U.S. District Court for the Southern District of Mississippi for "Al" or "Ol' boy."

Angel Ortiz, passports from Nigeria and Canada, a personal telephone directory, telephone records, and other personal papers belonging to Asibor.

On December 21, 1994, a seven-count indictment was returned against Asibor, Ladejobi, and three other co-conspirators.[3] The indictment charged Asibor with conspiracy to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) ("Count I"), and being an alien who had previously been convicted of an aggravated felony and deported and then found in the United States without the express consent of the Attorney General of the United States to reenter the United States in violation of 8 U.S.C. § 1326(b)(2) ("Count VI").  Ladejobi was indicted for conspiracy to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (also "Count I"), distribution of 29.7 grams of cocaine base in violation of 21 U.S.C. § 841(a)(1) ("Count IV"), distribution of 27.1 grams of cocaine HCL in violation of 21 U.S.C. § 841(a)(1) ("Count V"), and being an alien who had previously been convicted of an aggravated felony and deported and then found in the United States without the express consent of the Attorney General of the United States to reenter the United States in violation of 8 U.S.C. § 1326(b)(2) ("Count VII").

On September 7, 1995, the trial court granted Asibor and Ladejobi's motions to sever Count I from Counts VI and VII.  On September 29, in the United States District Court for the Southern District of Mississippi, a jury found both Asibor and Ladejobi guilty of conspiracy as alleged in Count I of the indictment.  Ladejobi was also found guilty of possession with intent to distribute as alleged in Counts IV and V.  The court further found that pursuant to the relevant conduct standard,

---

[3] Also indicted in Count I for conspiracy were Eddie McGraw, Sr. ("McGraw"), Anthony Epps, and David Savanna Lee; however, the government dismissed the conspiracy charge against McGraw.  McGraw was also indicted on two counts (Counts II and III) of possession with intent to distribute in violation 21 U.S.C. § 841(a)(1).  The roles played by these parties are of no significance  to the issues raised on appeal.

4

Ladejobi was responsible for distributing cocaine in an amount equivalent to 1,692.3 kilograms of marijuana. In a separate jury trial, Asibor and Ladejobi were found guilty of illegal entry into the United States in violation of 8 U.S.C. § 1326(b)(2).

## DISCUSSION

Asibor and Ladejobi assign numerous points of error to their trial proceedings. We discuss each of those points below.

Asibor attacks his convictions on Count I and Count VI. Specifically, he argues that: (1) the search of his house violated the Fourth Amendment to the United States Constitution because there was no search warrant and his wife's consent was coerced and involuntary; (2) the evidence was insufficient to support a conviction because the transactions that were the subject of the indictment were with a government informant; (3) taped conversations between him and VanCleave are inadmissible hearsay, since VanCleave was a government informant, and by law not a co-conspirator; (4) the court abused its discretion by not giving the requested jury instruction regarding the buyer-seller relationship between Asibor and VanCleave; (5) the court abused its discretion by not transferring Count VI to Houston; (6) the court committed reversible error in refusing to instruct the jury that if in "good faith" he believed he had the consent of the United States Attorney General to re-enter the country, then Asibor could not be found guilty on Count VI; (7) his deportation hearing was fundamentally unfair and violated the Due Process Clause to the United States Constitution; and (8) his motion for judgment of acquittal should have been granted because on December 8, 1994, the date he is alleged to have committed the offense of being found in the country, he was being held involuntarily in custody.

5

Ladejobi appeals his convictions on Counts I, IV, V, and VII. He argues that in regard to Counts I, IV, and V, the court reversibly erred by not instructing the jury on his theory that the evidence showed multiple conspiracies rather than a single conspiracy as charged in the indictment; his due process rights were violated by the outrageous conduct of the government in its use of VanCleave as an informant; and the drug charges should be dismissed because the trial court erred in overruling his objections to the evidence offered. As for Count VII, Ladejobi contends the illegal re-entry charge should be dismissed because the court erred in overruling his objections to the evidence offered; the illegal re-entry charge failed to charge an essential element of the crime; the court committed reversible error by failing to instruct the jury that if in "good faith" he believed he had the consent of the United States Attorney General to re-enter the country, he could not be found guilty of illegal re-entry; and the court wrongly assessed the entire amount of drugs to him as relevant conduct at sentencing.

For purposes of this appeal, Ladejobi adopted Asibor's arguments regarding insufficiency of the evidence, the courts decision to admit the hearsay evidence over objection, the courts refusal to give buyer-seller instruction, and the courts refusal to give "good faith" instruction on illegal re-entry charge. Thus, we address these issues contemporaneously.

I.      SUFFICIENCY OF THE EVIDENCE

The standard of review for determining whether there was sufficient evidence to convict a defendant is whether the evidence, when reviewed in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction, allows a rational fact finder to find every element of the offense beyond a reasonable doubt. *United States v. Flores-Chapa*, 48 F.3d 156, 161 (5th Cir.1995). The evidence is viewed in the light most favorable to the

6

verdict, accepting all credibility choices and reasonable inferences made by the trier of fact which tend to support the verdict. *United States v. Jiminez*, 77 F.3d 95, 97 (5th Cir. 1996).

## A. The Drug Conspiracy

In order to prove a conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, "the government must prove beyond a reasonable doubt that (1) an agreement existed between two or more persons to accomplish unlawful ends, (2) the defendant had knowledge of the agreement, and (3) the defendant voluntarily participated." *United States v. Crooks*, 83 F.3d 103, 106 (5th Cir. 1996) *(*citing *United States v. Casilla*, 20 F.3d 600 (5th Cir.) , *cert. denied*, 115 S. Ct. 240 (1994)). The "agreement may be tacit, and the jury may infer its existence from circumstantial evidence." *Id.* (citing *United States v. Thomas*, 12 F.3d 1350 (5th Cir.), *cert. denied*, 114 S. Ct. 1861 (1994)).

Asibor and Ladejobi argue that VanCleave provided their only link to the other defendants and that link alone is insufficient to support their convictions for conspiracy under Count I of the indictment.

During the trial, the government introduced taped conversations of the co-defendants referring to each other and acknowledging their awareness of the infrastructure of the cocaine conspiracy. In one specific instance, Ladejobi refers to Asibor as "Stan," the cocaine provider. Yet in another, Asibor refers to Ladejobi as "Jobi," who is to receive half of the cocaine. Other tapes include Epps referring to Lee as "Rooster," and Lee acknowledging that he has $6,000 for part of a two kilo delivery. Furthermore, the tapes revealed a conversation in which Asibor was a participant and references were made to all of the co-defendants. Thus, there is sufficient evidence to support a jury

7

conclusion that Asibor and Ladejobi were aware of the role played by each of the co-defendants and their involvement in the conspiracy to distribute cocaine.

Viewed in the light most favorable to the verdict, a reasonable jury could infer that Asibor and Ladejobi were involved in a conspiracy to distribute cocaine. The conspiracy here is analogous to a wheel. Asibor is at the center of the conspiracy as the drug supplier, the hub. The other defendants are drug distributors, the spokes of the wheel. Asibor would send cocaine from Houston to Jackson via VanCleave. Once the cocaine arrived in Jackson, it would be divided among Ladejobi and the others for distribution throughout the Jackson area. Asibor would collect payment from the distributors based on the share of the cocaine each received. Thus, just as the hub and spokes act together to support the rim of a wheel, so too did Asibor, Ladejobi and the other defendants act in concert in furtherance of this criminal enterprise. We believe that the government presented a wealth of evidence showing that Asibor and Ladejobi were involved in a cocaine conspiracy. Accordingly, we disagree with appellants' contentions and conclude that the evidence, viewed as a whole, in the light most favorable to the verdict, is more than sufficient to prove the existence of a conspiracy beyond a reasonable doubt.

### B.  Illegal Re-entry into the Country by Asibor

Asibor argues that his conviction under Count VI, in which the government alleges that he committed the crime of illegal re-entry on December 8, 1994, a date on which he was in the custody of law enforcement officials, was physically impossible and the court erred in refusing to grant his motion for acquittal. In order to prove a violation of 8 U.S.C. § 1326, the government must prove

8

arrest, deportation, and re-entry.[4] *United States v. Deleon-Rodrigues*, 70 F.3d 764, 766 (3d Cir. 1995).

We have previously addressed this issue in *United States v. Santana-Castellano*, 74 F.3d 593 (5th Cir. 1996).[5] In *Santana-Castellano*, we announced that the purpose of the "found in" provision in Title 8 U.S.C. § 1326 is "to provide punishment for an alien who, following his deportation . . . and without the permission of the Attorney General . . . having re-entered remains illegally in this country until his presence is discovered." *Id.* at 597. In ascertaining whether illegal re-entry was a continuous offense, we applied the Supreme Court's definition which provides that a continuous offense is "a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy." *Id.* (citing *United States v. Midstate*

---

[4] Title 8 U.S.C. § 1326 specifically provides:
   (a) Any alien who--
      (1) has been arrested and deported or excluded and deported, and thereafter
      (2) enters, attempts to enter, or is at any time found in, the United States, unless (a) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior Act,
   shall be fined under title 18, United States Code, or imprisoned not more than 2 years or both.

   (b) Notwithstanding subsection (a), in the case of any alien described in such subsection --
      (1) whose deportation was subsequent to a conviction for commission of three or misdemeanors involving drugs, crimes against the person, or both, or a felony (other than an aggravated felony), such alien shall be fined under title 18, United States Code, imprisoned not more than 10 years or both; or
      (2) whose deportation was subsequent to a conviction for commission of an aggravated felony, such alien shall be fined under such title, imprisoned not more than 20 years, or both.

[5] In *Santana-Castellano*, the defendant, who had previously been arrested and deported by the INS was found and charged with illegal re-entry in violation of Title 8 U.S.C. § 1326 while incarcerated in a Texas prison facility. The defendant pled guilty to illegal re-entry into the United States on June 7, 1994, however, on appeal defendant urged that he had actually been in the country since 1992 and thus, the district court erred in its use of the sentencing guidelines in finding that he committed the crime of illegal re-entry after he had been convicted of child abuse, and as such, subject to consecutive sentencing.

9

*Horticultural Co.*, 306 U.S. 161, 166, 59 S. Ct 412, 414, 83 L.Ed. 563 (1939)). Thus, we held that a previously deported alien who surreptitiously re-enters the country after previously being arrested and deported and who is subsequently discovered by Immigration and Naturalization Service ("INS") officials, is guilty of a continuous offense, and will be considered "found in" the United States (for purposes of this statute) "when his physical presence is discovered and noted by the immigration authorities." *Id*. at 598. Furthermore, we expressly stated that the date of the alien's "surreptitious entry is irrelevant." *Id*.

At trial, the government proved that Asibor was arrested in Houston after previously being deported on July 27, 1992, and that Asibor was "found in" the United States without having received permission from the Attorney General to re-enter.[6] The exact manner of his re-entry is unknown, although it appears that he did not enter through a recognized port of entry. Based upon the facts presented at trial, we can reasonably infer that the INS "found" Asibor on December 8, 1994 while incarcerated in a Mississippi prison facility and the date Asibor actually re-entered the United States is, as we have said, of no legal significance. Thus, we find that Asibor committed the crime of being "found in" the United States on December 8, 1994, and affirm the decision of the district court.

## II.    THE ADMISSION OF THE RECORDED EVIDENCE

We review the district court's evidentiary rulings for an abuse of discretion. *United States v. Parks*, 68 F.3d 860, 867 (5th Cir. 1995), *cert. denied,* _____ U.S. _____, 116 S.Ct. 825, 133 L.Ed.2d 768 (1996). If an abuse of discretion is found, the harmless error doctrine is applied. *United*

---

[6] The issue of whether Asibor re-entered the United States without the express consent of the Attorney General of the United States is discussed in depth in section III-B.

10

*States v. Skipper*, 74 F.3d 608, 612 (5th Cir. 1996). Consequently, we will affirm evidentiary rulings unless they affect a substantial right of the complaining party. *Id*.

### A. Taped Conversations by VanCleave and McKinley Owens

Asibor and Ladejobi argue that four tape recorded conversations between VanCleave and Epps, and VanCleave and McKinley Owens ("Owens")[7] were inadmissable hearsay and all statements admitted and attributed to McKinley were inadmissible hearsay.

The appellants first argue that as a government informant, VanCleave could not be a co-conspirator and as such, the tape recordings were inadmissible hearsay and improperly admitted. They also contend that since Owens was not included in the trial, any statement attributed to him is hearsay. At the outset, we must acknowledge that "the trial court has broad discretion in determining the admissibility of such evidence [taped conversations] . . . the paramount purpose of the inquiry is to insure the accuracy of the recording." *United States v. Hughes*, 658 F.2d 317, 322 (5th Cir. 1981).

In considering appellants' argument, we must first determine whether VanCleave is a co-conspirator. We have previously concluded that there can be no conspiracy between one defendant and a government informer. *United States v. Manotas-Mejia*, 824 F.2d 360, 365 (5th Cir. 1987)(citing *United States v. Martino*, 648 F.2d 367, 405 (5th Cir. 1981), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 474 (1982)). Thus, a person cannot be a conspirator while cooperating with the government, although the person may have been a part of the continuing conspiracy prior to becoming an informer. *Id*. Most importantly, we have held that a conspiracy may exist among

---

[7] McKinley Owens was an unindicted and unnamed member of the conspiracy.

11

three or more people "even [if] the link connecting many of the co-conspirators is a Government informer." *Id.*

The co-conspirator hearsay exception allows a statement made by one member of a conspiracy during the course of and in furtherance of the conspiracy to be admitted into evidence if the trial court concludes that: (1) a conspiracy existed; (2) the co-conspirator and the defendant against whom the co-conspirator's statement is being offered were members of the conspiracy; and (3) the statement was made during the course and in furtherance of the conspiracy. *United States v. Torres*, 685 F.2d 921, 925 (5th Cir. 1982)(citing *United States v. James*, 590 F.2d 575, 577 (5th Cir.)(en banc), *cert. denied*, 442 U.S. 917, 99 S. Ct. 2836, 61 L.Ed.2d 283 (1979). *See* Fed. R. Evid. 801(d)(2)(E). Furthermore, "statements made by a non-testifying co-conspirator are admissible against the defendant if there is 'independent evidence of a concert of action' in which the defendant was a participant." *United States v. Dawson*, 575 F.2d 656, 659 (5th Cir. 1978).

In the instant case, the grand jury indicted five people on the charge of conspiracy, including Asibor and Ladejobi. The record also reflects that even though Owens was not indicted and not named, he was still considered a member of the conspiracy. Prior to the admission of the tapes, the government produced extensive evidence in support of the charges that Asibor, Ladejobi, Owens, and the others were engaged in a conspiracy to distribute cocaine in the Jackson area. It appears that the government's sole motivation in offering the tapes was to support this proposition. Upon review of the record and the tapes, we note that the conversations contained therein involved members of the conspiracy and included statements in furtherance of the conspiracy, including specific references to actions by the appellants. Thus, we conclude the government produced ample independent evidence of the existence of the conspiracy between Asibor, Ladejobi and the other co-conspirators prior to

12

the district court's admission of the tapes. Therefore, we affirm the district court's evidentiary ruling admitting the taped conversations as evidence of the conspiracy.

## B. Failure of Trial Court to Provide Limiting Instruction

Appellants also argue that the district court erred in failing to give a limiting instruction each time the tapes were admitted into evidence. We acknowledge that "it is plainly better practice to caution the jury both when evidence . . . is introduced and at the close of evidence, [however,] repetition is not a requirement of a definite cautionary instruction." *United States v. Holley*, 23 F.3d 902, 912 (5th Cir. 1994) The record indicates that the trial court cautioned the jury about relying on their own recollection of the tapes both before the first tape was played and before the case was submitted for deliberation. We find no abuse of discretion in the district court's refusal to provide a limiting instruction each and every time a tape was admitted into evidence. Therefore, we affirm the district court's application of the limiting instruction.

## C. Admission of Evidence Establishing Other Offenses

Ladejobi argues that pursuant to Fed. R. Evid. 404(b)[8] the district court erred in admitting evidence establishing other offenses in his drug trial and trial for illegal re-entry and that the admission of such evidence was highly prejudicial. More specifically, Ladejobi seeks to have this court declare inadmissible tape recorded evidence of various acts committed by other members of the conspiracy, including evidence of miscellaneous drug deals, acts of violence, and specific references to Asibor's violent propensities. The government counters that this evidence was not offered as evidence of

---

[8] Rule 404(b) of the Federal Rules of Evidence provides, in pertinent part, that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . .".

13

extrinsic acts of Ladejobi under FRE 404(b), but instead was offered to show the full nature of Ladejobi's involvement in the conspiracy.

Whether we consider the admissibility of the complained of tapes under FRE 404(b) or some other rule of evidence, the crux of Ladejobi's argument is that the probative value of the tapes, if any, is exceeded by their prejudicial effect. After listening to tapes G-7 and G-11 and reviewing their transcripts, we agree that portions of the tapes contain explicit sexual language and profane characterizations that are peripheral to the allegations in the indictment. Arguably, this language could have confused or misled the jury. However, we also note that Ladejobi acquiesced in the situation he now complains of. For reasons that are not clear from the record, the tapes were not screened by the court before they were played for the jury. Furthermore, in response to Ladejobi's objection to the admissibility of the tapes at trial, the government asserted that Ladejobi was in possession of the tapes and transcripts for several months prior to trial and never sought to have the tapes or transcripts excised of the most inflammatory and marginally relevant material. Indeed, after the jury heard the tapes, the district court and the government agreed that had Ladejobi requested in advance that the tapes be excised of the extraneous references, such a request would have been granted.

In ruling on the objection, the district court exercised its broad discretion under Fed. R. Evid. 403 to balance the probative value of the evidence against its prejudicial effect.[9] In essence, the court was faced with a damage control dilemma. While fully convinced that the tapes, as a whole, contained admissible evidence which was probative of Ladejobi's involvement in the conspiracy, the

_____

[9] Fed. R. Evid. 403 provides, in pertinent part, "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury . . .".

court sought to minimize any harm caused by the extraneous recorded references by limiting the scope of direct examination so as not to allude to any of the complained of material, admonishing the jury to disregard specific statements made on the tapes, and refusing to allow the jury access to the tapes and transcripts during deliberations. We find no abuse of the district court's discretion pursuant to FRE 403.

After careful review of the record, we conclude that the evidence contained in tapes G-7 and G-11 was "inextricably intertwined" in the conspiracy. In *United States v. Ridelhuber*, 11 F.3d 516 (5th Cir. 1993), we acknowledged a line of precedent which holds that "evidence of an uncharged offense arising out of the same transactions as the offenses charged in the indictment is not extrinsic evidence within the meaning of Rule 404(b), and is therefore not barred." *Id.* (citing *United States v. Maceo*, 947 F.2d 1191, 1199 (5th Cir. 1991), *cert. denied*, 503 U.S. 949, 112 S.Ct 1510, 117 L.Ed2d 647 (1992)). The government produced the tapes along with a substantial amount of evidence establishing Ladejobi's knowledge and participation in the drug conspiracy. Thus, we hold that the district court did not err in its admission of the tapes as evidence of the conspiracy.

## III.    THE JURY INSTRUCTIONS

The appellants contend that the district court committed reversible error by refusing to give a buyer-seller instruction, as well as by not instructing the jury that the appellants were entitled to a "good faith" defense for violation of 8 U.S.C. § 1326. Ladejobi argues, individually, that the court committed reversible error in denying his request for a jury instruction on the issue of multiple conspiracies.

We review the refusal to provide a requested instruction for abuse of discretion. *United States v. Myers*, 104 F.3d 76 (5th Cir. 1997). We recognize that district courts enjoy substantial

15

latitude in formulating jury instructions, thus we will reverse only if the requested jury instruction (1) was a substantially correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial, the omission of which seriously impaired the defendant's ability to present an effective defense. *Id.* at 80; *United States v. Trevino-Martinez*, 86 F.3d 65, 67 (5th Cir. 1996)(quoting *United States v. Smithson*, 49 F.3d 138, 142 (5th Cir. 1995)).

### A.  The Buyer-Seller Drug Instruction [10]

We have held that it is reversible error to refuse a charge on a defense theory for which there is an evidentiary foundation, and which, if believed, would be legally sufficient to support an acquittal. *United States v. Maseratti*, 1 F.3d 330, 336 (5th Cir. 1993)(citing *United States v. Schmick*, 904 F.2d 936, 943 (5th Cir. 1990), *cert. denied*, 498 U.S. 1067, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991). However, a trial judge is under no obligation to give a requested jury instruction that misstates the law, is argumentative, or has been covered adequately by other instructions. *Id*. at 336.

In *Maseratti*, we addressed the issue raised by appellants. In that case, we held that the question of whether a defendant is a buyer/seller, and whether a defendant is a member of a conspiracy are mutually exclusive. *Id*. So long as the jury instruction given by the court accurately reflects the law on conspiracy, this court will conclude that the buyer-seller relationship has also been adequately covered. *Id*. Stated simply, the requested instruction was within the realm of the court's instruction addressing the conspiracy issue, and as such, the buyer-seller relationship was adequately

---

[10] The appellants requested the trial court to include a jury instruction which stated "the existence of a mere buyer-seller relationship in and of itself is not sufficient to prove a conspiracy."

covered by the conspiracy instruction.  The district court properly denied the appellants' request for a buyer-seller jury instruction.

## B.  The "Good Faith" Defense to Illegal Re-entry Instruction

Appellants argue that the district court reversibly erred by not instructing the jury as to a "good faith" defense for violation of 8 U.S.C. § 1326.  Asibor and Ladejobi were deported in 1992. Subsequently, their spouses filed a Petition to Classify Status of Alien Relative for Issuance of Immigrant Visa ("Form I-130") to assist their husbands in gaining admission to the United States. In each case, the petition was approved and the Immigration and Naturalization Service ("INS") issued a response,[11] which states in pertinent part, that the immigrant "petition [for relative, fiancé, or orphan] has been approved . . .We have sent it to the Department of State Immigrant Visa Processing Center . . . this completes all INS action on this petition . . . please read the back of this form carefully for more information."[12]  Appellants base  their "good faith" arguments on this letter by urging that they reasonably relied on this INS approval as tantamount to permission to reenter the country.  Consequently, the jury should have been allowed to consider their "good faith" as a defense to the illegal re-entry charge.

At the outset, we note that the approval of Form I-130 results in the beneficiary of the petition being classified as an immediate relative for purposes of issuing a visa for admission to the United

---

[11]  Immigration and Naturalization Form-797.

[12]  The back of the form expressly states "Approval of an immigrant or nonimmigrant petition means that the person for whom it was filed, called the beneficiary, has been found eligible for the requested application.  However, approval of a petition does not give any status or right.  Actual status is given when the beneficiary is given the proper visa and uses it to enter the United States.  Please contact the appropriate U.S. consulate directly if you have any questions about visa issuance."

States; it does not grant a visa or permanent resident status.[13] Thus, we conclude that the appellants' argument that the court committed reversible error in failing to include a "good faith" jury instruction is not persuasive because it stems from a fundamental misapprehension of Form I-130 and more importantly, the law of the circuit.

We recently addressed this issue in *United States v. Trevino-Martinez*, 86 F.3d 65 (5th Cir. 1996). There, Trevino, a Mexican Citizen, had been arrested in the United States and convicted of possession of marijuana with intent to distribute. After a six-month jail term, he was deported. Later, Trevino sought to return to this country and applied for a visa at the United States consulate in Monterrey, Mexico. The consulate issued Trevino a ten-year non-immigrant visa. Subsequently, while in the United States, Trevino was indicted, tried, and convicted on the charge of illegal re-entry in violation of 8 U.S.C. § 1326. At trial, Trevino sought to have the jury instructed that "if the jury found that he mistakenly believed that he had obtained proper authorization to reenter the United States and if this mistaken belief was reasonable," he was entitled to an acquittal. *Id*. at 67.

---

[13] *See generally* Scott E. Friedman, *The Immigration Act of 1990 -- a Primer on Green Cards*, 63 Jan. N.Y. St. B. J. 48 (1991)(explaining that the spouse of the illegal alien files a petition (Form I-130) seeking to have the alien classified as an immediate relative for priority visa status for admission to the United States. The INS sole consideration upon receipt of the form is whether a qualifying relationship exists between the petitioner and the proposed beneficiary (alien). Upon approval of the petition, the INS sends an approval notice to the petitioner indicating either the immediate availability of a visa or that a visa is not available yet. If a visa is not available, the approval notice specifies a priority date which indicates the beneficiary's place on the waiting list for a visa. The final step in the process requires the beneficiary to submit a visa application to the U.S. consulate in his or her respective country. Once a visa becomes available, the Consulate sends the alien a package of materials (known as "Packet III") which contains instructions and forms for completion. Upon completion of the packet, the Consulate schedules an interview with the alien and sends additional forms to be completed ("Packet IV"). The interview is not scheduled until after all of the requirements in Packet IV have been fulfilled. During the interview, the interviewing consular official focuses on whether the alien is excludable and whether he or she is likely to become a public charge. If the visa is approved, it is issued for a four month period in which the beneficiary must apply for admission to the U.S. border, where he or she will undergo a final interview with an immigration inspector. The immigration inspector has the authority to either accept the visa and grant the alien permanent resident status or deny entry into the United States).

18

In rejecting Trevino's argument we stated, "Congress did not impose a requirement of specific intent anywhere in the statute nor did it provide that an alien's reasonable belief that he was legally entitled to reenter the United States is a defense to criminal liability. This court concludes that § 1326 does not require the government to prove specific intent nor does it provide an alien who reenters this country illegally with a defense of reasonable mistake." *Id.* at 68-69 (emphasis added) (footnotes and internal citations omitted).

*Trevino* controls our decision today. Appellants attempt to avoid the holding in *Trevino* by arguing that where, as here, the INS "may have misled" them into believing that their re-entry was legal, good faith is a viable defense to the illegal re-entry charge. Creative though it may be, this assertion is unfounded in the law and meritless. The proposed jury instructions are directly contrary to the express language of 8 U.S.C. § 1326 and are an incorrect statement of the law. Therefore, we find the district court properly denied the requested "good faith" jury instructions.

## C. Ladejobi's Multiple Cocaine Conspiracy Instruction

Ladejobi contends the court committed reversible error in denying his request for a jury instruction on the issue of multiple conspiracies, and on this basis his conviction on Count I should be reversed. He argues that at best the evidence shows he shared a common supplier with the other defendants.

When a defendant timely requests a jury instruction and the trial court rejects that instruction, the Court of Appeals limits its review to whether the requested jury instruction was supported by the evidence. *United States v. Ross*, 58 F.3d 154, 158 (5th Cir. 1995). When considering whether there was a single conspiracy or multiple conspiracies, "we must consider the times, places, persons, offenses charged and the overt acts involved." *Id.* at 158 (citing *United States v. Greer*, 939 F.2d

19

1076, 1087 (5th Cir. 1991), *cert. denied*, 507 U.S. 962, 113 S.Ct. 1390, 122 L.Ed.2d 764 (1993));

*United States v. Marable*, 578 F.2d 151, 154 (5th Cir. 1978). Here, the conspiracy involved drug

sales made between April, 1994 and December 21, 1994, the date of indictment. The government

produced evidence showing that all of the co-conspirators involved in the distribution of the drug

utilized a common supplier, Asibor. The drugs were transported from Houston to Jackson by

VanCleave. All of the co-conspirators, including Ladejobi, participated in the division of the drugs

received from Asibor. All of the sales took place in the same small area of Jackson. Asibor would

collect payment from each co-conspirator based on the amount of the drugs each received. The

government also produced recorded conversations in which the co-conspirators discussed each other

and the overall criminal enterprise. Thus, the evidence does not support the theory that Ladejobi was

only involved in a separate conspiracy unrelated to the conspiracy charged in Count I of the

indictment. To the contrary, Ladejobi was knee-deep in the conspiracy to distribute cocaine in the

Jackson area. Accordingly, the district court properly denied Ladejobi's requested jury instruction.

## IV. THE ILLEGAL RE-ENTRY CHARGES

### A. Sufficiency of the Indictment Against Ladejobi

We review *de novo* a question of the sufficiency of the indictment. *United States v. Green*,

964 F.2d 365, 372 (5th Cir. 1992), *cert. denied*, 506 U.S. 1055 (1993). An indictment is sufficient

when it (1) contains the elements of the offense charged, (2) fairly informs the defendant of the

charges he must meet, and (3) there is no risk of future prosecutions for the same offense. *United*

*States v. Arlen*, 947 F.2d 139 (5th Cir. 1991), *cert. denied*, 112 S. Ct. 1480 (1992). Moreover, the

validity of an indictment is determined by reference to practical, not technical considerations. *United*

*States v. Morton*, 657 F.2d 736, 739 (5th Cir. 1981).

Ladejobi attacks the indictment as void for failing to state an essential element of the offense of illegal re-entry. Specifically, Ladejobi argues that the indictment omitted language indicating that the "Attorney General had not expressly consented to such alien's reapplying for admission." As stated previously, it is a crime for an alien who has been arrested and deported or excluded and deported to re-enter the United States unless prior to his re-entry, the Attorney General has expressly consented to his reapplying for admission. 8 U.S.C. § 1326. In pertinent part, Count VII of the indictment states: "Ganiu Ladejobi, an alien to the United States and citizen of Nigeria, having previously been convicted . . . [of] an aggravated felony, arrested and deported from the United States on May 21, 1992, was found in the United States without having received the express consent of the Attorney General to reenter the United States; all in violation of Section 1326(b)(2), Title 8, United States Code." It is obvious that the indictment contains all of the elements of the charged offense. At oral argument, counsel conceded this issue, thus we reject this contention as being meritless.

## B.  Denial of Transfer of Venue to Houston

We review all questions concerning venue under the abuse of discretion standard. The trial court is entitled to broad discretion in ruling on motions to transfer venue, and its decision will be upheld absent an abuse of discretion. *United States v. Duncan*, 919 F.2d 981 (5th Cir. 1990), *cert. denied*, 111 S. Ct. 2036 (1991).

As a general rule, the district courts of the United States shall have jurisdiction of all causes, civil and criminal, arising under Title 8. When the United States brings such an action, the United States attorney has the duty to prosecute the suit in any place in the United States where the violation occurred or where the person charged with the violation may be apprehended. 8 U.S.C. § 1329.

21

Asibor argues that under the statute, his trial should have been held in the district where the crime occurred (i.e., Houston) and Jackson, Mississippi was an improper venue because it bears no relationship to the time and location of the offense. Though initially arrested in Houston by law enforcement officials, at the time Asibor was located by the INS and charged with the crime of illegal re-entry, he had been convicted and was incarcerated in the state of Mississippi. Therefore, we conclude that Asibor was "found" and apprehended by INS officials on December 8, 1994 while incarcerated in Mississippi. Venue was proper in Mississippi and the district court acted within its authority in denying Asibor's motion to transfer venue.

## C. The Deportation Hearing

We review constitutional challenges *de novo*. *United States v. Perez-Torres*, 15 F.3d 403 (5th Cir. 1994). The Supreme Court has held that an alien must be permitted to collaterally challenge a deportation order which is used as an element of a criminal offense. *United States v. Mendoza-Lopez*, 481 U.S. 828 (1987). Following the Supreme Court decision, we have devised two distinct but related requirements that must be met by an alien wishing to challenge a deportation order in a prosecution under 8 U.S.C. § 1326: (1) the alien must show that the hearing was "fundamentally unfair," and (2) the collateral attack on a deportation hearing should be allowed if, in addition to being fundamentally unfair, the hearing effectively eliminated the right of the alien to challenge the hearing by means of judicial review of the deportation order. *United States v. Zaleta-Sosa*, 854 F.2d 48, 51 (5th Cir. 1988)(citing *United States v. Palacios-Martines*, 845 F.2d 89 (5th Cir. 1988), interpreting *Mendoza-Lopez* , 481 U.S. at 828.).

Asibor contends his deportation hearing violated due process for the following reasons: (1) he was denied the right to contact the Nigerian Consul; (2) the INS incorrectly informed him that

two years was the maximum penalty; (3) he was never told he could appeal the deportation; and (4) no attorney was physically present to represent him at the deportation hearing. At trial, the court reviewed the deportation hearing transcript and found no defect.

In analyzing Asibor's claims under the two-step process previously announced by this court, we find that Asibor's deportation hearing was not "fundamentally unfair." *See Zaleta-Sosa*, 854 F.2d at 52 (holding that failure to notify alien of right to contact Mexican Consul was not fundamentally unfair); *Perez-Torres*, 15 F.3d at 405 (holding that when a defendant is given notice that re-entry into the United States without permission is a felony, and statute under which defendant was previously convicted provides sufficient notice to satisfy due process requirements, the penalty not provided for in the statute of conviction is adequately noticed by being called for in a separate statute.); *Kin Sang Chow v. Immigration and Naturalization Service*, 12 F.3d 34 (5th Cir. 1993)(recognizing the right of attorney to attend deportation hearing via telephone). Furthermore, a review of the record indicates that Asibor's contention that he was not advised of his right to appeal is meritless. The transcript of the immigration proceeding conducted by Immigration Judge Charles A. Wiegand, III, on May 12, 1992 in Oakdale, Louisiana, reveals Asibor was represented via telephone by Attorney Richard L. Prinz. It further shows that Judge Wiegand informed Asibor of his right to appeal and after a brief conference with his attorney, Asibor reserved his appeal rights. Judge Wiegand questioned Asibor's attorney as to whether he had the proper forms for appeal and informed him that an appeal had to be perfected on the tenth day from the date of the hearing, specifying May 22, 1992.

IV.    THE SEARCH OF ASIBOR'S HOME

23

We review *de novo* the voluntariness of consent to a search. In evaluating the voluntariness of consent, we apply the *Ruigomez* analysis.[14] *See United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir. 1983). No single factor is dispositive in determining the voluntariness of consent thus, in determining whether consent was voluntary, we look at the totality of the circumstances. *Id*. This circuit has steadfastly adhered to the proposition that where there are contradictory facts as to the voluntariness of a search, the determination is a question of fact reserved for the district court and will not be disturbed unless found to be clearly erroneous. *See United States v. Cooper*, 43 F.3d 140 (5th Cir. 1995); *United States v. Fierro*, 38 F.3d 761 (5th Cir. 1994); *United States v. Ponce*, 8 F.3d 983 (5th Cir. 1993); and *United States v. Kelley*, 981 F.2d 1464 (5th Cir. 1993).

It is well settled that a person who has joint control over the premises may validly consent to its search. *United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir. 1991). Though Asibor and the government assert contradictory versions of the events leading to Mrs. Asibor's signing of the consent form, the trial court concluded that Mrs. Asibor, as co-owner of the residence, consented to the search. [15]

At the drug trial, Asibor filed a motion to suppress the evidence found during the search of his home, however, after applying the six factors, the district court concluded that Mrs. Asibor

---

[14]The six factors are as follows: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and, (6) the defendant's belief that no incriminating evidence will be found.

[15] The defense argues that Mrs. Asibor was told that if she did not cooperate, she would be arrested for conspiracy, and despite her request to speak with an attorney before consenting to the search, DEA officers continued to harass her. On the contrary, the government claims that Mrs. Asibor simply admitted that Stanley Asibor was her husband and signed the consent form.

voluntarily consented to the search and denied Asibor's motion.[16]  Upon review of the facts, we agree.  The record supports a finding of voluntary consent in that the DEA agents read the form to Mrs. Asibor and then presented it to her to read, and only after she read the form did she sign it and allow the DEA agents to proceed with the search.  There are no indications in the record that Mrs. Asibor was threatened, did not understand the effect of consent, or believed that incriminating evidence would be discovered.

## V.  OUTRAGEOUS GOVERNMENT CONDUCT

We review *de novo* a trial court's denial of a defendant's motion to dismiss an indictment based on outrageous government conduct.  *United States v. Graves*, 556 F.2d 1319, 1322 (5th Cir. 1977), *cert. denied*, 435 U.S. 923 (1978).  The issue is "whether the government's prosecution of the crime would abridge fundamental protections against unfair treatment."  *United States v. Smith*, 7 F.3d 1164, 1168 (5th Cir. 1993) (quoting *United States v. Mitchell*, 812 F.2d 1250, 1254 (9th Cir. 1987)).

Ladejobi argues that the district court erred in denying his motion to dismiss the indictment because his due process rights were violated by the outrageous conduct of the government in its use of VanCleave as an informant.  Specifically, Ladejobi alleges that VanCleave supplied cocaine to him, then purchased the same cocaine back from him.

---

[16]  In relation to the six factors, the district court found that: (1)  Mrs. Asibor was not under arrest and was told that she was not under arrest; (2) she was not the subject of any threats; (3) though initially upset, Mrs. Asibor became cooperative and consented to the search stating that she "had not done anything wrong" and did not "have anything to hide;" (4) she was and was fully aware of her right to refuse to consent; (5) she is an intelligent lady and has some education past high school and fully understood the provisions of the consent form; and (6) she believed  no incriminating evidence would be found.

We have consistently held that "[g]overnment misconduct does not mandate dismissal of an indictment unless it is 'so outrageous' that it violates the principle of 'fundamental fairness' under the due process clause of the Fifth Amendment." *United States v. Johnson,* 68 F.3d 899, 902 (5th Cir. 1995) (citing *United States v. Russell*, 411 U.S. 423, 431-32 (1973)). "Such a violation will only be found in the rarest circumstances." *Id.* (citing *United States v. Yater*, 756 F.2d 1058, 1066 (5th Cir.), *cert. denied*, 474 U.S. 901 (1985)). Thus, a defendant who asserts the defense of outrageous government conduct has an extremely high burden of proof.

Furthermore, in order to avail himself of the outrageous conduct defense, the defendant must show government overinvolvement combined with a passive role by the defendant. *United States v. Arteaga*, 807 F.2d 424, 427 (5th Cir. 1986). Where the court finds that the defendant is an active, willing participant in the criminal conduct that leads to his arrest, we will not find outrageous government conduct. *Id.*

Here, the trial court found that even if the government agents "both supplied the drugs to defendants and then bought them back with government funds," this conduct is far less extreme than conduct in other cases in which the Fifth Circuit has rejected the outrageous conduct defense. *See United States v. Tobias*, 941 F.2d 267, 270 (5th Cir. 1991)(DEA agents approached defendant and offered to help him manufacture drugs, phoned him to pursue the arrangement, supplied the expertise, sold the defendant the equipment, and supplied him with the laboratory site). We conclude that the district court did not err in so finding. Furthermore, Ladejobi has failed to show that the government was overinvolved in the drug conspiracy or that he was nothing more than a passive participant. Accordingly, we hold that the district court did not err by denying Ladejobi's motion to dismiss the indictment.

## VI.     THE AMOUNT OF COCAINE ASSESSED TO LADEJOBI

We review factual findings made by a district court for sentencing purposes under the clearly erroneous standard, and review the district court's legal application of the guidelines *de novo*. *United States v. Esqueda-Moreno*, 56 F.3d 578, 580 (5th Cir. 1995).

At the sentencing hearing the district court made specific findings of fact and held that Ladejobi was accountable, pursuant to the relevant conduct standard, for an amount of cocaine that converted to 1,692.3 kilograms of marijuana.[17] Ladejobi argues that neither the evidence at trial nor the evidence in the pre-sentencing report supports this inference. Furthermore, Ladejobi argues that no evidence was presented to show that he was aware of the scope of the entire conspiracy, and more importantly, actively participated in the conspiracy.

The record reveals that the district court held Ladejobi, Epps and Lee responsible for the entire amount of cocaine distributed in the Jackson area which is the equivalent of 1,692.3 kilograms of marijuana, however, Asibor was the only member of the conspiracy held accountable for the total amount of drugs seized. Moreover, the record shows that in sentencing Ladejobi, the district court relied on the pre-sentencing report indicating Ladejobi was a third-time drug offender. In October 1979, Ladejobi was convicted of delivery of marijuana. In February 1981, he was found guilty of possession of marijuana in an amount less than a kilogram, and later that same year, he was again convicted of possession of marijuana, less than one ounce. Finally, in December 1985, Ladejobi was found guilty of possession of cocaine with intent to distribute. We conclude that under the Federal

---

[17]   The court's initial calculation of the sentencing guideline placed Ladejobi at a base level of 32,

Sentencing Guidelines, Ladejobi was to be sentenced as a career offender,[18] and as such, the district court's use of said guidelines and the resulting sentence were not clearly erroneous.

For the foregoing reasons, we

AFFIRM.

---

[18] Classification as a career offender within the meaning of 4B1.1, raised Ladejobi's total offense level to 34 placing him in a criminal history category of 6. The imprisonment range for category 6 is 262 months to 327 months.