REVISED SEPTEMBER 9, 2008

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 14, 2008

Charles R. Fulbruge III
Clerk

No. 07-50737

UNITED STATES OF AMERICA

Plaintiff - Appellant

v.

LUIS POSADA CARRILES

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas

Before KING, HIGGINBOTHAM, and SOUTHWICK, Circuit Judges.

KING, Circuit Judge:

The United States appeals the dismissal of an indictment charging false statements in naturalization proceedings. The basis for this dismissal was the district court's findings that the government engaged in deceptive conduct and outrageous tactics during these naturalization proceedings. The United States also appeals the suppression of statements made by the defendant on the basis of incompetent translation in the naturalization interview at which the statements were made. For the reasons that follow, we reverse the dismissal of the indictment, reverse the suppression of the statements made at the naturalization interview, and remand the case for further proceedings.

## I. Facts and Proceedings

A.   Factual Background

The defendant, Luis Posada Carriles, is a well known anti-Castro Cuban exile who has been associated with several major events in modern Latin American history.  The events directly at issue in this case, Posada's entry into the United States and his subsequent attempt to become a naturalized American citizen, begin in 2005.  In order to fully understand the issues swirling around Posada's naturalization application, though, it is necessary to go back much further, to the early 1960's and the aftermath of the Cuban Revolution.

Posada, a Cuban native, moved to the United States in 1960, the year after the fall of the Batista regime and Fidel Castro's rise to power.  To say the least, Posada has never approved of the Castro regime; in his own pleadings in the district court, Posada is described as "unabashedly opposed to the domination of his native country of Cuba by the tyrannical dictator Fidel Castro and his brother Raul."  In 1961, Posada became involved with the planning for the Bay of Pigs invasion and was brought into contact with the CIA.  He later enlisted in the United States Army, was commissioned a second lieutenant, and received special training at Fort Benning with other former members of the 2506th Cuban Brigade who had been commissioned in the United States Armed Forces.  Posada was honorably discharged from the Army in March 1964.  Unclassified documents contained in the record indicate that from 1965 until 1974 he operated as a paid CIA asset, although Posada asserts that he maintained a relationship with the CIA well into the 1980's.

Posada went to work for the Venezuelan secret police in 1967 and eventually became the head of a security division in charge of surveillance, VIP protection, weapons, and explosives.  In this capacity, he directed counter-insurgency operations against leftist guerillas supported by Castro.  Posada was later arrested by Venezuelan authorities in connection with the 1976 bombing

of a Cubana Aerolineas aircraft in which all 73 people aboard were killed. After several years, he escaped from prison while still awaiting trial. Venezuela still seeks extradition; Posada, for his part, denies any involvement and claims that the charges were orchestrated by Castro.

After his escape from Venezuelan prison, Posada made his way to El Salvador. There he became involved in supplying arms and materiel to aid the U.S.-backed Contras fighting against the Sandinistas in Nicaragua, an operation that came to light as part of the Iran-Contra affair.

Posada moved to Guatemala in 1989 and was employed in security by the state telephone company. In 1990, he was shot several times in the face and torso during an assassination attempt allegedly carried out by Cuban agents. Throughout the 1990's he lived under assumed names in various Central American countries. When a series of hotel and tourist-site bombings occurred in Havana in 1997, Posada was suspected of involvement. The following year, he was the subject of two front-page articles in the New York Times in which he claimed a coordinating role in planning and executing the bombings. Posada later asserted, however, that his statements had been misunderstood and distorted by the reporter who interviewed him.

In 2000, Posada was arrested in Panama in connection with an attempt to assassinate Fidel Castro at a summit meeting in that country. He was detained for several years and ultimately convicted of crimes against national security (a Panamanian offense related to the manufacture or acquisition of bomb-making materials[1]) and counterfeiting public records. The outgoing president of Panama pardoned Posada in August 2004.

Posada entered the United States illegally some time in March 2005. He filed an asylum application and was scheduled to attend an interview with

---

[1] This charge is referred to in the record by several other names, including "public endangerment."

immigration officials on May 17, 2005, but, on that day, he cancelled the interview, withdrew his asylum application, and held a press conference announcing his presence in Miami. Immigration officials took Posada into custody later that afternoon, and a few days later, on May 21, 2005, he submitted to an interview. Posada was ultimately placed in removal proceedings and, on September 27, 2005, ordered removed "to any country, other than Cuba and Venezuela, willing to accept him." The immigration judge found that due to his history of anti-Castro activities, Posada would face a clear probability of torture if deported to Cuba or Venezuela. But since no other country was willing to accept him, Posada remained detained in an immigration-law equivalent of limbo. On October 12, 2005, Posada filed an application for naturalization with United States Citizenship and Immigration Services ("USCIS"). This application and the related naturalization proceedings—which ultimately formed the basis for Posada's indictment on false statement charges—are discussed in greater detail below.

Meanwhile, at some point the government opened an investigation into the nature and manner of Posada's entry into the United States in March 2005. Posada maintained that he had entered the United States by land through Mexico with the assistance of a coyote (this was apparently the story that he told immigration officials at the May 21, 2005, interview), but media reports as well as public statements by Castro indicated that he had actually entered by sea into Miami aboard the vessel Santrina. There were reasons to suspect that this in fact represented the truth. The Santrina was owned by the Caribe Foundation, and on November 15, 2005, federal agents conducting an unrelated search of that organization's Miami offices discovered a Guatemalan passport bearing Posada's picture issued in the name of "Manuel Enrique Castillo Lopez." This passport indicated that "Castillo Lopez" had traveled from Guatemala to the Mexican province of Quitana Roo, in which the city of Cancun is located, in

March 2005. Documents provided by the government of Mexico revealed that the Santrina had run aground at Isla Mujeres, an island off the coast of Cancun, on March 15, 2005. There were also reports that Posada had been on Isla Mujeres around this time.

B.    Naturalization Proceedings

Posada initiated the naturalization proceedings at issue in this case by filing a Form N-400 application for naturalization. The basis for application was his service in the U.S. armed forces during a period of military hostilities and his honorable discharge. See 8 U.S.C. § 1440.

The Form N-400, although obviously adapted to its stated purpose as a naturalization application, is a form of the type familiar to anybody who has ever applied for a government job or sought a government benefit. The form first requires the applicant to provide basic biographical information, e.g., full legal name as well any other names used, address, social security number, date and place of birth, nationality, marriage and family status, employment history, military service, and selective service registration. It also contains a variety of questions relevant to the issue of citizenship and the applicant's moral character. Among other things, the applicant is asked if he has ever: been a member of the Communist Party, any other totalitarian organization, or a terrorist organization; advocated the overthrow of any government by force or violence; been associated with the Nazi government of Germany; been arrested, cited, or detained by any law enforcement officer; been convicted of a crime; committed a crime for which he was not arrested; been a habitual drunkard or prostitute; sold or smuggled illegal drugs; helped anyone enter or try to enter the United States illegally; given false or misleading information while applying for an immigration benefit or to prevent deportation; or lied to any U.S. government official to gain entry or admission into the United States. The applicant is also

asked whether he supports the Constitution and form of government of the United States and is willing to take the Oath of Allegiance.

The last page of the Form N-400 instructs the applicant to certify under penalty of perjury that the application is true and correct. There is also a declaration required of the individual (if any) who prepared the application for the applicant (Posada's application was prepared by an attorney). Finally, there is an additional part of the application that the applicant is instructed not to complete until told to do so by an INS (now USCIS) officer. Under the heading "Signature at Interview," the applicant is required to swear before an immigration officer that the contents of the application, including any corrections made at the interview, are true and correct. Below are spaces for the signatures of both the applicant and the officer.

Immigration regulations govern the scope of the naturalization proceedings after a Form N-400 is filed. These regulations require that USCIS conduct an investigation of the applicant that consists, at a minimum, of a review of "all pertinent records [and] police department checks." 8 C.F.R. § 335.1. The regulations also provide for an interview at which the applicant is to be questioned under oath: "[s]ubsequent to the filing of an application for naturalization, each applicant shall appear in person before a Service officer designated to conduct examinations . . . ." Id. § 335.2(a). At the interview, the examining officer is to correct the applicant's written application so far as necessary to conform with the answers given in person by the applicant; at the end of the interview the applicant then must swear to the truth of the application, including any corrections made at the interview, and sign the last page of the Form N-400 in the presence of the examiner. Id. § 335.2(c), (e).

Posada's naturalization application was assigned for investigation to Susana Bolanos, an adjudications officer with USCIS who specializes in cases that may involve national security or immigration fraud. Bolanos traveled from

her station in Washington, D.C., to El Paso, where Posada was detained, to conduct Posada's naturalization interview on April 26 and 27, 2006. Also present at this interview were an attorney from the Department of Homeland Security, an attorney from the Department of Justice's Office of Immigration Litigation, Posada's two attorneys, and a Spanish-language interpreter provided by the government.

At the beginning of the naturalization interview, Posada was informed in English and Spanish that: the proceeding would be conducted under oath; any statement could be used in any legal or administrative proceeding; lying or giving false information could subject him to criminal or civil penalties; he could exercise his right against self-incrimination if he thought that an answer would incriminate him; and he could terminate the interview at any time. The interview was conducted in a mixture of English and Spanish. At times questions would be put to Posada in English and translated into Spanish by the interpreter; Posada would then give answers in Spanish which would be translated into English by the interpreter. At other times, however, Posada simply listened to the questions in English and responded in English without the use of the interpreter.

Posada's naturalization interview lasted approximately eight hours over the course of two days. Among other things, Posada was asked about his history of anti-Castro activities, the 1997 Havana bombings, two alleged plots to assassinate Castro, his activities with the Venezuelan secret police, his use of names other than his legal name, the Guatemalan passport bearing his picture issued in the name of "Manuel Enrique Castillo Lopez," his means of entry into the United States, the circumstances of his imprisonment in Venezuela and Panama, and any criminal acts for which he had not been arrested. Posada answered many of the questions but at times invoked the Fifth Amendment and refused to answer. In accordance with the regulations described above,

corrections were made to Posada's Form N-400 to conform to Posada's responses during the course of the interview, and at the conclusion of the interview Posada initialed the portions of the application that were corrected and signed his name in the presence of Bolanos.

By letter of August 24, 2006, USCIS denied Posada's naturalization application.

C.    Proceedings in the District Court

On January 11, 2007, a federal grand jury returned a seven-count indictment charging Posada with making false statements in connection with efforts to obtain naturalization.   Posada was charged with one count of naturalization fraud (relating to false statements both on his written Form N-400 naturalization application and during the April 2006 naturalization interview) and six counts of making false statements in a naturalization proceeding (five counts involving the naturalization interview and one count involving the Form N-400).   The allegedly false statements identified in the naturalization interview were statements relating to Posada's entry into the United States in March 2005, specifically, that he had traveled into the United States over land through Mexico, that he had never been aboard the Santrina or seen four individuals who had been aboard it at the time, that he had never been in Cancun or Isla Mujeres, and that he never had a Guatemalan passport. The allegedly false statement identified in the Form N-400 was Posada's representation that the only two names he had used other than his own were "Ramon Medina" and "Franco Rodriguez"; it was the government's contention that Posada had also used the name on the Guatemalan passport, "Manuel Enrique Castillo Lopez."

The case was scheduled for jury selection and trial on May 11, 2007.  Less than two weeks before that date, on April 30, 2007, Posada filed a motion to suppress any statements made during the naturalization interview, as well as

any notes, tapes, or documents containing the statements, based on the government's failure to warn Posada of the existence of a criminal investigation. The thrust of Posada's argument in this motion was that the government had improperly used the naturalization interview for the purpose of gathering information or statements from him to serve as the basis for an indictment. Posada maintained that the government had been assembling a criminal case against him since April 2005, and yet did not warn him or his attorneys that he was the subject of any investigation at the time of the naturalization interview. Posada asserted that though it was clear (according to him) that he did not qualify for naturalization due to his prior foreign convictions in Panama, the government conducted the interview anyway, "not to gather information regarding his eligibility for naturalization . . . , but to obtain allegedly false statements to indict a 79 year old man who could no longer be indefinitely obtained in immigration custody . . . ."

In a second motion filed on April 30, 2007, Posada urged the district court to exclude as evidence the tapes and transcript of the naturalization interview due to: (1) the poor quality of the tapes; (2) inaccurate translation during the interview by the government-provided interpreter; and (3) inaccurate transcription and translation of the tapes. In this motion, Posada argued that the tapes contained an excessive amount of inaudible portions, that the interpreter rendered inaccurate and incomplete translations of the questions posed to Posada, and that the translators who produced the transcript of the interview were not court certified or otherwise qualified. The district court, finding it necessary to conduct an in camera inspection of the interview tapes, entered an order on May 1, 2007, requiring the government to produce the tapes by noon on the following day. The government produced the tapes and also filed responses to Posada's motions on May 2, 2007. Two days later, on May 4, 2007, the district court held a pre-trial hearing on all pending motions.

Susanna Bolanos, the adjudications officer who had interviewed Posada, testified at this hearing. She explained that upon being assigned Posada's application, she had reviewed his Form N-400 and quite-extensive "Alien File," and also performed her own research on the Internet. She testified that when she first reviewed Posada's application and other available materials, "it seemed . . . that he might not be eligible" for naturalization, but that she scheduled an interview anyway. She explained that it was standard practice to schedule an interview, and that an interview would be scheduled even though an applicant may appear to be ineligible in order to allow the applicant to clarify any issues in the application and because applicants are entitled to an interview.

Bolanos further testified that while preparing for Posada's interview, she met with the two government attorneys who would be present at the interview, as well as an additional attorney from the Department of Justice. According to Bolanos, the purpose of this meeting, which occurred no more than a month before her trip to El Paso, was to review the questions, prepare for the interview, and make sure that the questions would "flow." She testified that nobody ever told her to ask any particular questions at the interview, and that all of the questions that she prepared were relevant to the eligibility requirements for naturalization.

Carlos Spector, an immigration lawyer, testified on Posada's behalf as an expert. Spector testified that: he had participated in around 700 naturalization interviews; having an aggravated felony conviction is the "capital death penalty" for an applicant seeking immigration relief such as naturalization because such a conviction acts as a statutory bar to naturalization; in his experience naturalization interviews typically last, at most, half an hour; and government lawyers had never been present at an interview that he had been to.

On May 8, 2007, the district court issued an order excluding the tapes and transcripts, suppressing the statements made at the interview, and further

dismissing the indictment. After noting that it had thoroughly reviewed the enhanced digital copy of the tapes multiple times with the aid of a court-certified interpreter, the district court first found that the digital copy was inaudible at times, but that the inaudible portions were not so substantial as to render the digital copy untrustworthy. It next found inaccuracies in the transcript of the interview that made the transcript unreliable, although it noted that if the indictment were not dismissed, there would still be time for the government to submit a new version of the transcript before trial.

Taking up Posada's challenge to the translation services provided by the interpreter at the interview, the district court analogized to cases involving interpreters at deportation hearings and identified a two-part test from the Ninth Circuit asking whether the interpretation was a competent one and, if not, whether the incompetent interpretation prejudiced the outcome of the proceeding. See Perez–Lastor v. INS, 208 F.3d 773 (9th Cir. 2000). Based upon a finding of "numerous instances where words were incorrectly interpreted or not interpreted at all, where [Posada] appeared to provide unresponsive answers as a result of his confusion over the questions, and where [Posada] expressed difficulty understanding what was said to him," the district court determined that the interpretation was incompetent. The district court also found prejudice, explaining that:

> No effective communication existed between [Posada] and the interviewers; they were, so-to-speak, "not on the same page." [The interviewers] believed they were asking one question, while [Posada] thought they were asking another. Even in cases where only one or two words were interpreted incorrectly, it completely changed the meaning and tenor of certain questions. . . . [T]he interpretation is so inaccurate as to render it unreliable as evidence of [Posada's] actual statements.

Accordingly, the district court held that Posada's testimony at the naturalization interview could not be considered as evidence in any future hearing. It also suppressed the tapes and transcripts as evidence.

Turning to Posada's motion to suppress the interview statements on the basis of the government's failure to warn of the existence of a criminal investigation, the district court categorized the concern as one of due process. After reviewing a number of cases in which the government was alleged to have acted deceptively in using civil proceedings to obtain documents or statements for the purpose of a criminal investigation, the district court concluded that in Posada's case "the evidence [was] overwhelming that the Government improperly manipulated the administration of criminal justice in order to secure a criminal indictment(s) against [Posada]." The district court determined that "there was no genuine [naturalization] interview and the entire interview was, instead, a pretext for a criminal investigation," and further found that the government engaged in "fraud, deceit, and trickery" by misrepresenting to Posada the purpose of the questions at the interview. In addition, it found the government's tactics "grossly shocking and so outrageous as to violate the universal sense of justice." Stating that it was "left with no choice," the district court dismissed the indictment.

The government filed timely notice of appeal on June 5, 2007.

## II. Standard of Review

The district court's evidentiary rulings are reviewed for abuse of discretion. United States v. Guidry, 456 F.3d 493, 501 (5th Cir. 2006). However, we review de novo the district court's interpretation of the law. Id.

The decision to dismiss an indictment on due process grounds is reviewed de novo, United States v. Asibor, 109 F.3d 1023, 1039 (5th Cir. 1997), although underlying findings of fact are reviewed for clear error, United States v. Barrera–Moreno, 951 F.2d 1089, 1091 (9th Cir. 1991).

## III. Discussion

The government argues that the district court erred in: (1) suppressing Posada's statements at the naturalization interview based on a finding that incompetent translation services were provided by the interpreter; and (2) dismissing the indictment based on findings of deception and outrageous conduct on the part of the government. As the latter issue is potentially dispositive of this appeal, we address it first.

A.    Dismissal of the Indictment

"[G]overnment misconduct does not mandate dismissal of an indictment unless it is so outrageous that it violates the principle of fundamental fairness under the due process clause of the Fifth Amendment." Asibor, 109 F.3d at 1039 (citation and internal quotation marks omitted). "Such a violation will only be found in the rarest circumstances." Id. (citation and internal quotation marks omitted). In dismissing the indictment in this case, the district court found that Posada's naturalization interview was not a genuine interview but instead was a pretext for a criminal investigation, and, relatedly, that the government engaged in fraud, trickery, and deceit by misrepresenting the purpose of the questions at the interview to Posada. The district court further found the government's tactics "so grossly shocking and so outrageous as to violate the universal sense of justice."

As a preliminary matter, we agree with the government that the district court erred in dismissing the portions of the indictment charging Posada with making false statements on his Form N-400 naturalization application. The government conduct identified by the district court as the grounds for dismissing the indictment simply has no relevance to these alleged offenses, which were completed before USCIS began adjudicating Posada's application, and long before the interview itself. Moreover, after carefully reviewing the record in light of the relevant law, we further agree that the district court erred in dismissing the remaining portions of the indictment charging Posada with making false statements at the naturalization interview. As we explain, neither of the grounds put forward by the district court—grounds which we have loosely characterized as government deception and outrageous conduct—supports the drastic remedy of dismissal of the indictment. Before turning to the record, though, we first examine the relevant law.

1.    General Principles

We begin with the well-settled rule that the government may conduct simultaneous civil and criminal proceedings without violating the due process clause or otherwise departing from proper standards in administering justice. See United States v. Kordel, 397 U.S. 1, 11–12 (1970). In Kordel, the FDA, in the course of an investigation into possible violations of the Food, Drug, and Cosmetic Act by a corporation and its officers, prompted the initiation of a civil suit seeking the seizure of some of the corporation's products. Id. at 3. The government later used information obtained in this civil proceeding to obtain criminal misbranding convictions against two of the corporation's officers.[2] Id. at 6. On appeal of these convictions, the Supreme Court rejected the officers'

---

[2] This point was apparently disputed by the government in Kordel, but for purposes of its opinion the Supreme Court assumed that the information aided the government in the criminal prosecution. See Kordel, 397 U.S. at 6 & n.6.

argument that the government's conduct "reflected such unfairness and want of consideration for justice" as to require reversal. Id. at 11. Finding no violation of due process, the Court explained that "[i]t would stultify enforcement of federal law to require a governmental agency such as the FDA invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief, or to defer civil proceedings pending the ultimate outcome of a criminal trial." Id.

Notwithstanding this general approval of the practice of conducting parallel civil and criminal proceedings, the government's ability to do so is not wholly unrestrained. This much can be seen in Kordel itself, where the Court was careful to note what type of case was before it and, in so doing, make it clear that under some circumstances the government's use of parallel civil and criminal proceedings may be improper. As the Court explained, it did "not deal . . . with a case where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; nor with a case where the defendant is without counsel . . . ; nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution." Id. at 11–12.

Although the Supreme Court has not yet had occasion to re-visit these issues, our own precedents are instructive. In United States v. Tweel, 550 F.2d 297 (5th Cir. 1977), a case in which improper government conduct of the type alluded to in Kordel figured prominently, the IRS initiated a tax audit at the request of the Organized Crime and Racketeering Section of the Department of Justice as part of a criminal investigation that ultimately led to the taxpayer's conviction on various tax fraud charges. Id. at 298–99. When approached by the IRS revenue agent, the taxpayer's accountant asked whether a "special agent"—the type normally involved in criminal investigations—was involved;

15

the obvious implication of this question was that the accountant wanted to know whether the audit was criminal in nature. Id. at 298. The revenue agent's negative response led the accountant to believe that the audit was merely a civil one, and the taxpayer thereafter produced records for inspection. Id.

On appeal, the taxpayer argued that those records should have been suppressed at trial on the basis of government deception. After recognizing the general rule that "the mere failure . . . to warn the taxpayer that the investigation may result in criminal charges, absent any acts by the agent which materially misrepresent the nature of the inquiry, do[es] not constitute fraud, deceit and trickery[,]" we found that the agent's response to the accountant's question, though technically true, had been intentionally misleading, and that "the [revenue] agent's failure to apprise the [taxpayer] of the obvious criminal nature of this investigation was a sneaky deliberate deception by the agent . . . and a flagrant disregard for [the taxpayer's] rights." Id. at 299 (internal quotation marks and citation omitted). Accordingly, we held that the records obtained from the taxpayer should have been suppressed at trial. Id. at 300.

We have continued to rely upon the principles discussed in Tweel in resolving challenges to the propriety of dual investigations by civil and criminal branches of a government agency (or dual investigations by separate agencies). See, e.g., United States v. Blocker, 104 F.3d 720, 729–30 (5th Cir. 1997) (affirming the denial of a motion to suppress where a state insurance examiner conducting an audit pursuant to a state administrative scheme had secretly agreed in advance to furnish any evidence of criminal activity to the FBI because the examiner did not exceed the scope of his authority under state law and there was no deception or misrepresentation about the scope or purpose of the audit); United States v. Powell, 835 F.2d 1095, 1099 (5th Cir. 1988) (same in a tax case where the civil audit was not initiated with criminal overtones but instead "grew" into a criminal investigation); United States v. Caldwell, 820 F.2d 1395,

1400 (5th Cir. 1987) (same in a tax case where evidence indicated that the civil audit was not requested as part of a clandestine criminal investigation); see also SEC v. ESM Gov't Sec., Inc., 645 F.2d 310, 311–12, 317 (5th Cir. Unit B 1981) (holding that government deception is grounds for denying an administrative subpoena where an SEC investigator failed to disclose the existence of an investigation and instead obtained access to the company's records under the guise of obtaining "education" for himself).

These cases affirm that a government official may not make "material misrepresentations" about the nature of the investigation or inquiry, Caldwell, 820 F.2d at 1399 (emphasis removed), but show that the burden is on the subject of the investigation to prove that such misrepresentations were made, see Blocker, 104 F.3d at 729 & n.11; Powell, 835 F.2d at 1099; Caldwell, 820 F.2d at 1399. And they also demonstrate that we have consistently adhered to the rule, discussed in Tweel, that the "mere failure" of a government official to warn that an investigation may result in criminal charges does not constitute fraud, deceit, or trickery. See, e.g., Blocker, 104 F.3d at 729 & n.11 (stating that there is no "affirmative duty to warn" and that the subject of investigation must show that he was intentionally misled); Powell, 835 F.2d at 1099 ("[R]evenue agents have no duty to inform taxpayers that the agents' investigations might result in criminal charges.").

2.    Government Deception

The district court found that "there was no genuine [naturalization] interview and the entire interview was, instead, a pretext for a criminal investigation," and, relatedly, that the government engaged in fraud, trickery, and deceit by misrepresenting the purpose of the questions at the interview. The district court identified Tweel as the seminal case in this area, and we likewise find it a useful place to begin our analysis. Indeed, the decision in Tweel was grounded in considerations similar to those expressed by the district court in this

case. As we have explained, the government's conduct in Tweel was objectionable because "there was no genuine civil audit of the kind represented; the only audit was a criminal audit specially ordered for [the] particular taxpayer, and falsely represented as a routine civil audit." Blocker, 104 F.3d at 729.

With regard to the district court's determination that the naturalization interview was merely a pretext for a criminal investigation, Tweel is distinguishable in at least two significant respects. First, in Tweel the revenue agent did not advise the taxpayer of his Fifth Amendment rights or warn that any information submitted by the taxpayer could be used in a criminal proceeding. Tweel, 550 F.2d at 299–300. As we recognized, though, this was consistent with the general rule that failing to warn that an investigation may result in criminal charges, absent affirmative misrepresentation, is not usually sufficient to constitute government deception. Id. at 299. Here, however, the government need not seek refuge in this rule because it did warn Posada (in the presence of Posada's lawyer) at the beginning of the interview that, among other things, he could exercise his right against self-incrimination if he thought that an answer would incriminate him, lying could subject him to criminal penalties, and any statement he gave could be used in any legal or administrative proceeding. We think faulty the district court's reasoning that these warnings "had little significance" because Posada "did not receive an explanation of the true import of the Government's inquiry."[3] As Tweel and subsequent cases make

---

[3] The district court additionally determined that the warnings "had little significance" as a result of the government's threats "that exercise of Fifth Amendment rights might result in termination of the naturalization interview." This reasoning is incorrect, however, because immigration officials may draw a negative inference from a naturalization applicant's silence. See INS v. Lopez-Mendoza, 468 U.S. 1032, 1043–44 (1984) ("'[T]here is no rule of law which prohibits officers charged with the administration of the immigration law from drawing an inference from the silence of one who is called upon to speak.'" (alterations in original) (quoting United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 153–54 (1923))); United States v. Alderete-Deras, 743 F.2d 645, 647 (9th Cir. 1984) (stating that in the context of a deportation

clear, while the government may not make affirmative material misrepresentations about the nature of its inquiry, it is under no general obligation of disclosure.

Second, whereas in Tweel the government approached the taxpayer and made misrepresentations that caused the taxpayer to participate in civil proceedings that were in fact undertaken entirely for the purpose of a criminal investigation, in this case it was Posada who, seeking to obtain an immigration benefit, approached the government and thereby initiated the civil proceedings at issue. The district court found this a distinction without a difference, but we disagree. Posada, not the government, triggered with his naturalization application a civil adjudicatory process that, by regulation, calls for both an investigation of the applicant and an interview. See 8 C.F.R. § 335.2. It strikes us as highly incongruous, to say the least, for these proceedings to then be characterized as a sham engineered by the government. Nonetheless, because we think it at least possible that under some circumstances civil proceedings initiated by the non-government party may be rendered pretextual or otherwise tainted by government misrepresentations, we turn to an examination of the district court's specific findings.

In determining that the interview was a pretext for a criminal investigation, the district court relied upon: (1) the fact that Bolanos "had already determined that [Posada] was probably not eligible for citizenship but nonetheless chose to interview him"; (2) the fact that Posada's application was

---

hearing an alien's "refusal to testify may form the basis of inferences against him in the deportation proceeding"). Our conclusion on this score is influenced by the fact that the burden of proof is on the applicant in a naturalization proceeding (which is a civil proceeding). See 8 C.F.R. § 316.2(b). The government did not act improperly in informing Posada, in accordance with this law, that his silence could be considered in adjudicating his application. Further, the fact that Posada nonetheless invoked the Fifth Amendment several times during the interview tends to undercut any argument that, for whatever reason, he felt unable to do so.

in part denied based on a determination that the pardon he received did not eliminate the immigration-law effects of his Panamanian conviction (which was the basis for Bolanos's initial determination that he might not be eligible); and (3) the "anomalous" aspects of the interview, including its length, the fact that it was taped, and the involvement of two interviewers, an interpreter, and four attorneys. Although we have no quarrel with these observations strictly as matters of fact (all are supported by the record), we think the district court misperceived their significance and, in so doing, erroneously found that the interview was merely a pretext for a criminal investigation.

First, although Bolanos did testify that when she initially reviewed Posada's application and the available materials "it seemed . . . that he might not be eligible" for naturalization, nothing in the record suggests that this preliminary determination in any way represented a final adjudication of Posada's application or otherwise obviated the need for an interview. As the government points out, it would be a harsh practice indeed to deny an interview to an applicant because a preliminary review of his application reveals that he might be ineligible. The regulations as well as the Form N-400 both seem to contemplate that, consistent with Bolanos's testimony, the very purpose of the interview, at least in part, is to give the applicant the opportunity to correct mistakes in the application and to clarify or respond to any issues that the examiner might have identified during the preliminary investigation.[4]

---

[4] The parties dispute whether a naturalization application may ever be denied without conducting an interview. We need not decide this issue, although we do note that the regulations plainly state that "each applicant shall appear in person before a Service officer designated to conduct examinations . . . ." 8 C.F.R. § 335.2(a). It is enough for our purposes to observe that Posada's Form N-400 raised issues that required clarification and explanation before his application could be finally adjudicated, and that providing this clarification and explanation is precisely the point of the interview. For example, Posada explained in an addendum to his Form N-400 that he had been "arrested . . . in Panama under the charge of Collective Safety and Collective endangerment," and received a presidential pardon. However, he offered no explanation for why this charge was filed or what the offense of "Collective Safety and Collective endangerment" constitutes, information that would be necessary to determine

Second, the district court read too much into the fact that Posada's application was ultimately denied, in part, on the ground that the pardon received from the president of Panama was not effective to remove the immigration-law consequences of his conviction. As the denial letter from USCIS indicates, the effect to be given a foreign pardon in the context of naturalization proceedings was not entirely clear. The letter explains that foreign pardons had long been held ineffective in the removal context, but also notes that the regulatory language governing pardons in the naturalization context differs from the statutory provision governing pardons in the removal context.[5] Although USCIS ultimately determined that foreign pardons should be treated the same in the removal and naturalization contexts, the careful consideration USCIS gave this issue belies any notion that the naturalization proceedings were a sham.

Third, we agree with the government that the aspects of the naturalization interview identified as "anomalous" by the district court—its duration, the presence of multiple attorneys and an interpreter, and the fact that it was taped—do not demonstrate that the interview was merely a pretext for a criminal investigation. We first note that several of the supposedly "anomalous" items are actually contemplated by immigration regulations, albeit as optional features of the interview. See 8 C.F.R. § 335.2(a) (applicant may request the presence of an attorney); § 335.2(c) (interview may be taped); § 335.2(f) (providing for use of interpreter). More to the point is the undeniable fact that, given his history and notoriety, Posada was a highly unusual applicant. There

---

whether the charge creates a statutory bar to naturalization.

[5] Indeed, this difference in language seems to cut in favor of the argument that pardons should be treated differently in naturalization proceedings. The removal statute specifically refers to a pardon "by the President of the United States or by the Governor of any of the several States," 8 U.S.C. § 1227(a)(2)(A)(vi), while the regulation governing pardons in the naturalization context makes no such distinction, see 8 C.F.R. § 316.10(c)(2).

is simply no reason to expect his naturalization interview to approximate that of a "typical" applicant. Indeed, Bolanos, who specializes in cases that may involve fraud or national security, was apparently assigned to Posada's application precisely because he was an extraordinary applicant. To give just two examples, we would venture to guess that USCIS does not often receive applications from individuals who, like Posada, admit to having "advocated . . . the overthrow of [a] government by force or violence" and claim an affiliation with the CIA. But these matters were just the tip of the iceberg when it came to Posada's application, and it is thus entirely unsurprising that his naturalization interview was atypical in the ways identified by the district court.

More broadly, nothing in the record suggests that the naturalization interview was anything other than a bona fide examination conducted in accordance with the applicable regulations. The form of the interview certainly conformed to those regulations. From the digital copy of the interview tapes it is apparent that at the beginning of the interview Posada was shown his Form N-400 and given the opportunity to consult with his attorneys and make any necessary corrections before the substantive portion of the interview began. After briefly discussing these corrections, Bolanos then started the process of going over the questions on the application with Posada and asking additional questions to clarify or fill out the record. This pattern began with the questions relating to basic biographical information (e.g., name, date of birth, social security number, citizenship status, marriage and family status) and continued over the course of the interview as Bolanos moved through the application—in many instances repeating the questions verbatim as they appear on the Form N-400—and solicited additional information as necessary.[6] Finally, at the

---

[6] To take just one example, at one point Bolanos asked if Posada had ever given false or misleading information to any U.S. government official while applying for immigration benefits or to prevent deportation, exclusion, or removal, a question that appears on the Form N-400 and to which Posada had checked the "yes" box. In the interview, Posada averred that

conclusion of the interview, Posada initialed the additional corrections to the Form N-400 that had been made during the course of the interview and, in accordance with the regulations, signed his name in the presence of Bolanos.

Nor did the questions posed by the government during the interview exceed the legitimate scope of inquiry delineated by the regulations. The district court suggested the opposite when it found that the government made misrepresentations to Posada about the purpose of the interview in response to objections raised at the interview by Posada's attorneys. In response to these objections, which charged that several lines of inquiry opened by the government were outside the scope of the naturalization proceedings because they related to events that occurred outside the "statutory period" for which a naturalization applicant is required to demonstrate good moral character,[7] Bolanos repeatedly stated that the questions were being asked for purposes of the record and that Posada's answers would be used to adjudicate his application. With these statements clearly in mind, the district court found that:

> [T]he Government engaged in fraud, deceit, and trickery when it misrepresented to [Posada] that the purpose of asking him such extensive questions about his means of entry into the United States, his conduct in Panama and Venezuela, and his use of various aliases and passports was merely to "clarify the record." The Court ponders exactly which record the Government sought to clarify. The Government did not merely ask him questions directed towards a moral character determination. They questioned him extensively about bombings and other violent activities. The mere fact that

---

he had given false information by lying to an immigration officer shortly after arriving in the United States. Bolanos followed up on this answer by asking when this had occurred, and in the ensuing discussion the circumstances of the incident were fleshed out. When the subject had been exhausted, Bolanos moved to another question from the Form N-400, and the interview continued in this vein.

[7] Naturalization applicants are required to establish good moral character for a "statutory period" of five years preceding the date of filing the application as well as the period from the date of filing to admission to citizenship. See 8 U.S.C. § 1427(a); 8 C.F.R. § 316.10.

they had to question him about bombings belies the argument that this was a routine naturalization interview.

Here the district court seems to have taken the view that questions about Posada's means of entry into the United States, his "conduct in Panama and Venezuela" (presumably his alleged involvement in the 1976 Cuban airliner bombing and a plot to assassinate Fidel Castro), and his use of various aliases and passports were irrelevant to adjudicating his naturalization application (and, specifically, irrelevant to the moral character determination), and that Bolanos's assertions to the contrary during the interview were, therefore, misrepresentations. This was error.

Preliminarily, it is important to note that though the naturalization applicant's burden is only to demonstrate good moral character during the statutory period—roughly the preceding five years, see 8 C.F.R. § 316.10(a)(1)—it does not follow that the applicant's conduct outside the statutory period lies beyond the scope of the moral character determination. The regulations expressly provide that USCIS:

> is not limited to reviewing the applicant's conduct during the five years immediately preceding the filing of the application, but may take into consideration, as a basis for its determination, the applicant's conduct and acts at any time prior to that period . . . if the earlier conduct and acts appear relevant to a determination of the applicant's present moral character.

Id. § 316.10(a)(2). Thus, the government was clearly within its rights to inquire into matters relevant to the moral character determination even though they may have occurred outside of the statutory period for which the applicant bears the burden of proof.

More to the point, though, the inquiries found objectionable by the district court were all manifestly relevant to the adjudication of Posada's naturalization application and the moral character determination. No explanation is required

24

for the proposition that the government's questions about "bombings and other violent activities" were relevant to Posada's moral character. With regard to Posada's entry into the United States, the government was aware of reports tending to indicate that he had entered by sea into Miami aboard the Santrina, and thus it had reason to believe that he had lied to immigration officials at the May 21, 2005, interview, where he claimed otherwise. It follows that the government was justified in inquiring into this subject at the naturalization interview, because whether Posada lied to immigration officials is relevant to both the moral character determination and the specific questions on the Form N-400 that ask if the applicant has ever "given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal" or "lied to any U.S. government official to gain entry or admission into the United States." The government's inquiry into Posada's use of aliases and passports was similarly justified. The Form N-400 specifically asks the applicant to list all other names used; among other things, this information obviously facilitates the government's investigation into the applicant's background. And since the government also had reason to believe that Posada had not in fact listed all of the names he had used (owing to the discovery of the Guatemalan passport at the Caribe Foundation offices in Miami), whether he had lied or misled immigration officials about this issue was also relevant.

Thus, there simply is no basis for the district court's conclusion that the government misrepresented to Posada the purpose of asking him certain questions at the interview. Bolanos told Posada that the questions were being asked for purposes of the record and in order to adjudicate Posada's application, and she further asserted that the government had the right to inquire into conduct outside the statutory period in making the moral character determination. Because the regulations make clear that the government did

have the right to inquire into these matters, which we agree were entirely relevant to adjudicating Posada's application, there is no basis in the record to find that the government misrepresented the purpose of the questions at the interview.

Finally, we note that apart from the actual interview proceedings themselves, the district court also found the Department of Justice's involvement in this case "suspicious." Specifically, the district court noted that Bolanos met with an attorney from the Department of Justice (along with attorneys from the Department of Homeland Security) prior to Posada's naturalization interview, and that everyone at this meeting "reviewed" the questions to be asked at the interview. But there is nothing inherently improper about this type of contact, especially given that the regulations governing naturalization proceedings expressly require USCIS to coordinate with outside law enforcement entities—including the FBI, an arm of the Department of Justice—in the course of investigating an applicant. See 8 C.F.R. § 335.1 (investigation to include, among other things, "police department checks"); § 335.2(b) (interview to occur only after completion of criminal background check by the FBI). Nor is there anything in the record that would allow us to conclude that the contact in this case was improper. Posada suggests that the "Government" (apparently the FBI) should not have provided USCIS with documents from criminal investigations relating to Posada's entry into the United States and the 1997 string of bombings in Havana (from the record it appears that the FBI provided at least one document related to the Havana bombings), but again, this is cooperation of the sort that is expressly contemplated by immigration regulations. It does not amount to government deception or misconduct.

3.  Outrageous Conduct

After determining that the government's conduct was deceptive, the district court additionally found the government's tactics "so grossly shocking

and so outrageous as to violate the universal sense of justice." Insofar as this finding refers to conduct of the government other than the conduct that we have already discussed and determined not to have been improper, we note that to demonstrate outrageous government conduct Posada needs to "show government overinvolvement combined with a passive role by [himself]." Asibor, 109 F.3d at 1039. Outrageous conduct will not be found when "the defendant is an active, willing participant in the criminal conduct that leads to his arrest . . . ." Id. "Such a violation will only be found in the rarest circumstances." Id. (citation and internal quotation marks omitted).

Here there can be no doubt that Posada was an active, willing participant in the conduct for which he was charged with a crime. Posada submitted the allegedly false Form N-400 and was a willing participant in the naturalization interview in which he is alleged to have made false statements. There is no basis for a finding of outrageous conduct here.

B.    Suppression of the Interview Statements

We next consider the district court's decision to suppress Posada's statements at the naturalization interview. Applying due process principles, the district court suppressed these statements on the basis that the translation provided by the interpreter at the interview was incompetent, and that this incompetent translation resulted in prejudice to Posada.

The government first challenges this ruling by arguing that due process considerations do not apply in this case and that Posada had no right to a competent interpreter at the interview. The district court concluded otherwise, by analogizing to a case involving the use of an interpreter in deportation proceedings, and determined that "the presence of a competent interpreter was . . . critical to the fairness of the naturalization interview because the interpreter was provided by the Government and the statements made later served as the basis for [Posada's] indictment." The government, arguing that these concerns

are misplaced, cites a Second Circuit decision for the proposition that there is an "important distinction" between removal proceedings and interviews to adjudicate an immigration benefit; namely, that in the latter situation the individual has affirmatively petitioned for a benefit. See Abdullah v. INS, 184 F.3d 158, 165 (2d Cir. 1999) (assuming that due process protections apply but noting that applicants for special agricultural worker status, i.e., an immigration benefit, face the government in a posture similar to immigrants applying for admission at the border, who have no constitutional rights in connection with their application).

In the end, we need not decide whether or to what extent due process considerations apply in naturalization proceedings, because we agree with the government that the crux of the district court's decision, though couched in due process terms, ultimately lies elsewhere. Specifically, the district court's concern seems to have been that incompetent translation at the naturalization interview rendered ambiguous the communications between the government and Posada and caused Posada to misunderstand the questions posed to him. Indeed, this much can be seen in the district court's explanation that Posada suffered "prejudice" because the interviewers "believed they were asking one question, while [Posada] thought they were asking another"; and because "[n]o effective communication existed between [Posada] and the interviewers; they were, so-to-speak, 'not on the same page.'"[8]

---

[8] Along the same lines, in a discussion of the deficiencies it identified in the translation provided by the interpreter, the district court noted instances where it found that: "the use of the wrong words and/or addition of words . . . . caused severe confusion during the interview"; "the question that the interviewer asked [was] not the question that [Posada] answered"; there was a "break-down in communication between Bolanos and [Posada]"; there was a "line of questioning that was confusing"; the interpreter "interpreted his own version of [a] statement [that] did not represent the spirit of the conversation"; and "[t]here [was] no guarantee that [Posada] understood the question being asked."

This is, at bottom, a false statements case. In such cases, it is not uncommon for a defendant to argue that because of some ambiguity or uncertainty in the question he is alleged to have answered falsely, his understanding of the question differed from that of the government (thus making the evidence insufficient to prove an essential element of the offense, usually some variation of the requirement that the statement was false and that the defendant knew it to be false). See United States v. Bell, 623 F.2d 1132, 1136 (5th Cir. 1980) (collecting cases). In these circumstances, the rule is that "the defendant's understanding of the question is a matter for the jury to decide," subject to an exception for cases where "'a reasonably minded jury must have a reasonable doubt as to the existence of the essential elements of the crime charged.'" Id. (quoting United States v. Reynolds, 511 F.2d 603 (5th Cir. 1975)). This exception is a narrow one. "It is only in exceptional cases that a question is so ambiguous, fundamentally ambiguous, such that no answer can be false as a matter of law. If there is no fundamental ambiguity, the jury resolves any ambiguities." United States v. Damrah, 412 F.3d 618, 627 (6th Cir. 2005).

We see no reason why our analysis here should not be guided by this general approach. The district court's finding that the interviewers asked one question but Posada answered a different one, as well as its finding that Posada and the interviewers were "not on the same page," seem to us in substance nothing less than a determination that, due to the vagaries of translation, Posada did not understand the questions put to him. And by ordering Posada's statements suppressed entirely, instead of allowing the jury to consider them, the district court essentially concluded that, as a matter of law, Posada's answers could not form the basis for a false statements conviction. To borrow the phrase employed by the Sixth Circuit, the district court found fundamental ambiguity.

Posada's argument that Bell and other similar cases are distinguishable because they did not involve pre-trial challenges to the reliability of an interpreter's translation is unavailing. This case is different in that the misunderstanding is thought to have arisen out of errors in translation rather than, say, the use of unclear language in phrasing the question, as might occur in the usual case. But it does not follow that the basic standards for determining whether fundamental ambiguity exists should not apply. In fact, in considering and rejecting a claim that translation errors rendered the questions and answers at issue in a false statements case "fatally ambiguous," the Second Circuit appears to have hewn quite closely to the standards we have discussed above. See United States v. Moon, 718 F.2d 1210, 1240–41 (2d Cir. 1983). We see no reason not to do so here as well.

In suppressing Posada's statements at the interview, the district court found numerous instances where words were incorrectly interpreted, where Posada appeared to be confused over questions and provide unresponsive answers, and where Posada expressed difficulty understanding what was said to him. A few examples of the deficiencies identified by the district court will suffice. At one point Posada was asked, in English, "But, from the time you were released from jail in Panama until you entered Mexico in March 23rd or 24th, you haven't been to Mexico?" The district court determined that the question put to Posada in Spanish by the interpreter, however, was a slightly different one: "Then, from the time you had been freed in Panama until you entered Mexico – 23rd or 24th of March, you had never been to Mexico prior to that date?" This, the district court observed, "could potentially cause numerous problems with respect to a time line and the Government's theory as to how [Posada] entered the country."

Posada was later asked, in English, "[A]fter you'd been arrested in Panama, did you ever tell any government officials that you had abandoned a

plan to detonate a car bomb in Panama?" The district court determined that the interpreter changed the meaning of this question by inserting a reference to the "North American" government. And at another point, the district court determined, the interpreter similarly injected an issue into a question that asked whether Posada had ever received passports from any other country by translating the question to ask whether Posada had received any passports from another country that were not legal.

The problem with the district court's analysis is that it failed to concentrate on the particular questions or line of questioning that led to the statements charged as false in the indictment. Our caselaw makes clear that although it is of course proper to consider the allegedly false statement "in the context in which it was given," it is still necessary to focus on the "crucial question and answer." Bell, 623 F.2d at 1136, 1137. This is consistent with the practice in other circuits. See, e.g., United States v. Reilly, 33 F.3d 1396, 1418 (3d Cir. 1994) (reviewing specific question-and-answer exchange underlaying false statement charge); Moon, 718 F.2d at 1239–41 (reviewing several specific exchanges in which false statements were alleged).

The Second Circuit's decision in United States v. Moon is particularly instructive in this regard. It demonstrates that translation errors apart from the critical question and answer, even if occurring in close proximity thereto, do not infect the crucial question and answer with ambiguity absent some special relationship. In Moon, the defendant challenged the questions and answers that led to his conviction on several counts of perjury as "erroneously translated and fatally ambiguous." 718 F.2d at 1239. With regard to one allegedly false answer to a question, the defendant argued that his immediately preceding two answers "were inaccurately translated and somehow cast the third answer in a misleading context." Id. at 1240. The court rejected this argument, reasoning that "[e]ven assuming inaccuracies with respect to the interpretation of the first

31

two answers, we fail to see any relationship between them and the third answer, the one alleged to be false." Id. at 1240–41.

It was not permissible for the district court to suppress Posada's statements at the interview unless translation errors affected the crucial questions and answers relevant to the false statements charged in the indictment in such a way that these statements, as a matter of law, may not form the basis for a false statements conviction. Otherwise the matter of Posada's understanding of the questions should have been left to the jury. See Bell, 623 F.2d at 1136. As we have explained, this question is to be removed from the jury only when "'a reasonably minded jury must have a reasonable doubt as to the existence of the essential elements of the crime charged.'" Id. (quoting Reynolds, 511 F.2d 603 (5th Cir. 1975)) (emphasis added). This point is reached "when it [is] entirely unreasonable to expect that the defendant understood the question posed to him." Reilly, 33 F.3d at 1416 (internal quotation marks omitted, brackets in original). "A question is not fundamentally ambiguous simply because the questioner and respondent might have different interpretations." United States v. Culliton, 328 F.3d 1074, 1079 (9th Cir. 2003).

Given this high threshold, the record simply does not support a finding of fundamental ambiguity. Or, put another way, there is no basis to conclude that, as a matter of law, Posada could not have understood the particular questions or lines of questions that led to the statements charged as false. Below we examine the relevant portions of the interview as they pertain to the various false statements charged in the indictment. We clarify that we do not hold here whether Posada did in fact understand the questions; indeed, he may wish to argue to the jury that for some reason he did not and, therefore, that his answers are not false statements within the meaning of the relevant statutes. We simply think that this is a matter for the jury to decide.

The indictment charges that Posada falsely stated that he never had any type of documentation, passport, or identification from Guatemala. The district court identified no translation errors in the portion of the interview relating to this topic, and we see nothing that would suggest that Posada did not understand the relevant questions. The interviewer asked, "Guatemala, have you ever had a passport from Guatemala?" This was translated as, "Guatemala, ¿usted tuvo un pasaporte de Guatemala?" Posada replied, "No." The interviewer later asked, "Nothing from Guatemala, ever?" This was translated as "Nunca, ningun de Guatemala," to which Posada replied, "Que yo recuerdo, no," or, in English, "That I remember, no." There is nothing fundamentally ambiguous about this exchange.

The indictment also charges that Posada falsely stated that he never saw the Santrina while traveling to the United States in March 2005 and that he never saw several individuals on board the ship at that time. From the discussion immediately preceding the crucial questions and answers on this point it is clear that Posada was aware of reports that he had arrived into Miami aboard the Santrina, and was also aware that Castro had made statements to that effect. Posada was then asked, "When you were in Mexico, did you ever see the Santrina?" This was translated as, "¿Cuando usted estuvo en Mexico, usted vio el Santrina?" Posada replied, "No." The topic of discussion then turned to the various other individuals that the government believed were aboard the Santrina with Posada. After these individuals were named, Posada was asked, "Did you see them at all while you were in Mexico?" This was translated as, "¿Cuando usted estuvo en Mexico usted alguna vez a estata personas las vio?" Posada replied, "No." Again, there is no basis for concluding here that, because of translation errors or otherwise, Posada could not have understood these questions as a matter of law.

The same can be said about the questions and answers relevant to the indictment's charge that Posada falsely stated that he was never in Cancun or Isla Mujeres when traveling to the United States in March 2005. Posada was asked, "Were you ever, in the trip to the United States in March of 2005, were you ever in Cancun?" This was translated as, "En el viaje que usted hizo a los Estados Unidos en marzo de 2005, ¿usted estuvo en Cancun?" Posada answered, "No." He was then asked, "Were you ever in Isla Mujeres?" Again he answered, "No."

Finally, the indictment charges that Posada falsely claimed to have entered the United States in March 2005 in Texas. This topic was thoroughly discussed at the interview, and at points errors in translation seemed to have caused some confusion over the "timeline" of this trip (as noted by the district court). But the ambiguity, if any, concerning the statements relating to Posada's manner of entry into the United States falls far short of fundamental ambiguity, as in other instances Posada seems to have clearly understood the significance of the government's questions. For example, Posada was asked when he had last entered the United States ("La ultima vez que usted entro aqui a los Estadoes Unidos, ¿cuando fue?"). He responded, "In marzo, creo, en marzo del ano 2005," meaning, "In March, I believe, in March of the year 2005." Shortly thereafter, after Posada indicated that this was around the 17th or 18th of March, he was asked, "And when you came to the United States in March 17th or 18th, where did you enter?" This was translated as, "Cuando usted se vino a Estados Unidos en marzo 17 o 18, ¿por donde usted entro a los Estados Unidos?" In response, Posada indicated that he entered through Matamoros (which is, of course, on the Texas border).

In sum, the district court erred in suppressing Posada's statements at the interview because it did not focus on the specific questions and answers relevant to the false statements charged in the indictment. And since there is nothing

fundamentally ambiguous about these questions and answers (whether by reason of faulty translation or otherwise), they should not have been suppressed.

## IV. Conclusion

For the foregoing reasons, the dismissal of the indictment in this case is REVERSED and the suppression of Posada's statements at the naturalization interview is REVERSED.  This case is REMANDED for further proceedings consistent with this opinion.