# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-20208

United States Court of Appeals
Fifth Circuit

**FILED**

April 13, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

FRANCISCO JAVIER RODRIGUEZ, also known as Silver Jesus Cundumi-Bonilla; EDWIN RIVERA-OTERO, also known as Luis Angel Maldonado Barroso, also known as Gary Charver Segura-Viveros, also known as Edwin Otero-Rivera; CARLOS MANUEL BORIA, also known as Luis German Rodriguez, also known as Victor; MARVIN CESAR CARABALI-DIAZ, also known as Alex Omar Aponte-Ortiz; ERIC ALBERTO LEWIS,

Defendants - Appellants

Appeals from the United States District Court
for the Southern District of Texas
USDC No. 4:11-CR-1-2

Before JOLLY and DENNIS, Circuit Judges, and REEVES\*, District Judge.

PER CURIAM:\*\*

These consolidated appeals arise out of the convictions and sentences of defendants Carlos Manuel Boria, Marvin Cesar Carabali-Diaz, Eric Alberto

---

\* District Judge of the Southern District of Mississippi, sitting by designation.

\*\* Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 13-20208

Lewis, Edwin Rivera-Otero, and Francisco Javier Rodriguez. The offense conduct centered around a "reverse-sting" operation involving the defendants' attempted armed robbery of a cocaine stash house. For the reasons stated below, we AFFIRM.

## I. Background

### A. Fictional Cover Story

In 2010, federal agents learned that a group of individuals in the Houston, Texas, area was seeking to rob a narcotics stash house. Based on this intelligence, the agents set up a reverse-sting operation wherein agent Richard Zayas would pose undercover in the role of a disgruntled narcotics courier looking for a group to rob a drug stash house.

Zayas gained his introduction to the defendants and their associates through an unidentified confidential informant ("CI"). After that introductory meeting, Zayas had four other meetings with the group in his undercover role. These meetings, along with more than twenty related phone calls, were recorded.[1]

Agent Zayas's completely fictional cover story was as follows: He is a drug courier who periodically traffics six to seven kilograms of cocaine for a Cuban drug trafficking organization. He retrieves the cocaine from a stash house but is not provided the location of the house until the day of the scheduled pick up. On that day, he is called and given fifteen minutes to arrive at the house. He always sees two individuals at the house: an armed person who stays with him and a second person who retrieves the cocaine from a back room. Zayas never sees money in the stash house. While Zayas waits for his

---

[1] Zayas initiated approximately one-third of the phone calls, generally when he had to return a call.

2

six or more kilograms of cocaine to be retrieved, he sees twenty-five to thirty additional marked kilogram packages of cocaine in the living room.[2] The two stash house workers give Zayas his allotment of cocaine and the delivery instructions, and Zayas leaves.

## B. Reverse-Sting Operation

On October 5, 2010, the CI introduced Zayas to defendant Carabali-Diaz, an unidentified man nicknamed Titi, and a third unidentified individual. Following that introduction, Zayas told them his fictional cover story. After providing his cover story, agent Zayas said he was nervous, and Titi responded, "Don't be . . . . This is going to turn out well." Carabali-Diaz asked several questions about the stash house. Zayas told Carabali-Diaz and Titi that the cocaine distributors he dealt with were "serious people" and the robbery would not be easy. Titi responded that Zayas need not worry and that the group would "go in there with everything." Carabali-Diaz noted that the group would have to remove the markings from the cocaine packages before selling them on the street. Carabali-Diaz and Titi discussed how the robbery would take place, and Titi stated that they would tie up the stash house occupants as well as Zayas. Carabali-Diaz said that the plan "look[ed] good." Zayas did not tell Carabali-Diaz and Titi to use firearms or how to conduct the robbery; he only explained who and what was in the house.

Two days later, agent Zayas again met Carabali-Diaz and Titi in his undercover role. The three men discussed the robbery plans. Carabali-Diaz and Titi said that five people would be in the robbery crew and that they would get into the house using police uniforms and vests.[3] Carabali-Diaz said that

---

[2] Agent Zayas testified that markings on cocaine packages are the hallmark of foreign cocaine intended for wide distribution.

[3] Zayas had not previously mentioned police uniforms.

he had "special people" to do the job and that the group was "prepared." He also discussed the use of firearms and the plan to tie up the stash house workers and occupants, including Zayas, to prevent the victims from realizing that Zayas was a part of the robbery team.

Less than three weeks later, agent Zayas participated in another meeting with three unidentified members of the group, including the unidentified individual from the October 5 meeting. Zayas informed the three men that he was scheduled to pick up the cocaine the next night and that he would call them to arrange a meeting location just prior to the pickup. Zayas reiterated that one of the stash house guards would be armed and that the robbery would not be "easy at all."

The next day, on October 26, agent Zayas arranged by phone for the group to meet him before the robbery. All of the defendants except Rodriguez were present for this pre-robbery meeting. Although Lewis was not part of the meeting initially, he had driven to the meeting location and joined the discussion after Zayas asked him if he planned to participate in the robbery.[4] Titi and an individual named Vito were also present. The group waited a while at the meeting location because an additional vehicle with two associates and several items needed for the robbery had not yet arrived.

While they waited for the two associates and robbery gear to arrive, and before Lewis joined the group, agent Zayas told the group that the robbery would be difficult and dangerous, stating "this is not easy," "this is for real man," and "this is no game." Defendant Boria responded that his associates were "experienced," that the group was armed and ready, that they had police uniforms, and that "everything will be done neatly." Titi noted that the

---

[4] Lewis drove Rivera-Otero to the meeting place and initially stayed in or near his car by himself while the others discussed the impending robbery some seven car-lengths away.

members of the group were "serious" and "used to all this" and that they "even ha[d] vests and police uniforms and everything."

After defendant Lewis joined the group, they discussed (1) the amount of cocaine that would be in the house; (2) that Lewis would find the stash house by entering the home's address into his GPS; (3) how they would bring firearms and pretend to be police; (4) that Zayas would have to get on the floor to avoid getting hurt; and (5) the general manner in which the robbery would occur, including rushing in with guns and knocking down and restraining the home's occupants. Agent Zayas did not instruct the defendants how to conduct the robbery but did ask them how they intended to do it.

After these discussions, the group was still waiting for the two other associates and the robbery gear. When the associates did not arrive in a reasonable time, agent Zayas decided to abort the plan to avoid blowing his cover and to ensure that all the perpetrators and firearms would be present for the arrests. Zayas told the group that he could not wait any longer; and defendants Boria, Rivera-Otero, and Carabali-Diaz said that he should go ahead to the stash house and they would execute the robbery the next time he did a pickup. Boria then gave Zayas a phone number at which Zayas could contact him directly. Boria also showed Zayas a tactical carrier vest that said "police." He stated that when Zayas came back, he (Boria) would have the group ready. Rivera-Otero added that the group was "for real." That evening, Boria told his girlfriend, who had been in one of the group's vehicles during the robbery-preparation meeting, that the group was planning to steal drugs from a stash house.

After the October 26 meeting, agent Zayas and defendant Boria spoke several times by phone, with most of the calls initiated by Boria. On October 29, Boria told Zayas that Boria, not Titi, would be the contact person for the robbery, and he asked Zayas to call him around Thanksgiving to tell him when

the next pickup would occur.  Boria called Zayas again on November 23.  Agent Zayas told Boria that his next pickup from the stash house would be on December 2.

On December 2, the defendants met at Boria's apartment without Zayas and planned the armed robbery.  The group discussed how they would enter the house, who would yell "police," and other logistical matters.  The defendants had police clothing and at least one firearm.  After their planning session, they put on their police clothing and left to meet Zayas.

The group, which included the five defendants, met Zayas in a parking lot.  All of the defendants except Lewis, the getaway driver, were wearing police clothing.[5]  Agent Zayas asked Boria if they had firearms.  Boria responded affirmatively and showed Zayas a pistol in the passenger door of the vehicle in which Boria had been sitting.  The group gathered around and discussed, among other things, the amount of narcotics that would be in the stash house, the stash house setup, and the manner in which the armed robbery would take place.  Lewis asked Zayas for the address to enter into his GPS.  He also told Zayas not to be nervous and stated that they would take all of the cocaine in the house.  Zayas asked if everyone was "all right," and no one responded in the negative or suggested any lack of desire to participate in the robbery.

Zayas pretended to take a phone call providing the location of the stash house and walked away from the group.  When agent Zayas was a safe distance away, a law enforcement tactical response team arrested the defendants.  Rodriguez dropped a black jacket and a police shirt when he attempted to flee.  Government agents recovered numerous items of police clothing, several firearms, and many flexible handcuffs (i.e., zip-ties) from the defendants' vehicles.

---

[5] The other driver, Boria's girlfriend, did not wear police gear either.

No. 13-20208

At no point did Zayas offer the defendants money or provide them guns or police uniforms with which to conduct the robbery. He also did not instruct them on how to execute the robbery. None of the defendants ever indicated any hesitation about proceeding.

## C.  The Defendants' Post-Arrest Statements

Following their arrests, some of the defendants spoke to each other in recorded conversations in police vehicles. Defendants Boria and Lewis said that the police did not have anything on them except for guns and that it was a good thing they were not arrested after entering the stash house and handcuffing people. Defendant Rivera-Otero and a group member named Ramirez also stated that the police did not have anything on them and discussed a plan to say that their police clothing was for Halloween. The two also discussed claiming that Zayas directed them to wear the police clothing.

Several of the defendants also spoke to agents after waiving their *Miranda* rights. Defendant Carabali-Diaz admitted that the group had planned to steal thirty-seven kilograms of cocaine, put the drugs in a trash bag (which he was holding when arrested), and divide the thirty kilograms that did not go to Zayas. He also said that firearms were going to be used and that everyone had a gun. Defendant Boria, who was still wearing police clothing during his post-arrest interview, admitted to the robbery plan, to having a gun, and to planning to sell the cocaine on the street. Defendant Rivera-Otero claimed that he had police clothing for Halloween and that he put it on because his friend told him to, although he (Rivera-Otero) did not know why. Defendant Lewis initially suggested that he knew little about the robbery plan but then acknowledged that the plan was to go into a stash house, "arrest" people using firearms and flexible handcuffs, and steal cocaine. Lewis said he was to be the getaway driver and expected to receive $10,000.

7

## D.  Defendants' Cases-in-Chief

Only Lewis presented a defense.  For his defense, Lewis presented two character witnesses and testified on his own behalf.  He claimed that he knew defendant Rivera-Otero from the gym and occasionally gave Rivera-Otero a ride because he (Rivera-Otero) had a suspended driver's license and no car. Lewis said that on October 26, Rivera-Otero asked him for a ride to talk to someone about a job.  According to Lewis, Rivera-Otero gave him directions to the meeting, and they ended up at a gas station.  Lewis testified that agent Zayas arrived at the gas station, and they followed Zayas in their car to a different location.  Lewis claimed that he had no knowledge of a robbery until Zayas approached him at the second meeting spot and offered to share the thirty kilograms of stolen cocaine.  Lewis said that he had never been involved with drugs before, but he decided to participate as a getaway driver because he had been laid off from work.

On cross-examination, Lewis acknowledged stating at a robbery-planning meeting that the occupants of the stash house would assume that there were additional police officers outside.  He also admitted to asking agent Zayas for the address of the stash house so he (Lewis) could put it into his GPS, and he admitted that he saw weapons at Boria's house at the December 2 robbery-planning meeting.  More generally, Lewis admitted that he knew the plan was to rob a house of approximately thirty kilograms of cocaine and that he was to be the getaway driver.

## E.  Charges and Jury Verdict

In 2012, a grand jury returned a superseding indictment charging the defendants[6] with several crimes, including

---

[6] Two other associates were also charged but are not parties to this appeal.

No. 13-20208

- Conspiracy to possess five kilograms or more of cocaine with the intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) and 846 ("Count 1");

- Aiding and abetting the attempted possession of five kilograms or more of cocaine with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2 ("Count 2");

- Conspiracy to use and carry firearms during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) and (o) ("Count 3"); and

- Aiding and abetting the use and carrying of a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2 ("Count 4").

Defendants Boria and Rivera-Otero were also charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) ("Count 5").[7]

A jury found Lewis not guilty of the conduct alleged in Counts 1 and 3. The jury found the five defendants guilty of the remaining charged offenses.

## II. Discussion

The defendants raise several arguments related to their convictions and sentences. We address each argument in turn.

### A. Motion to Dismiss the Indictment

Defendants Boria and Lewis argue that the district court erred in denying the defendants' motion to dismiss the indictment due to outrageous conduct by the government in setting up the reverse-sting operation. Our

---

[7] Boria, Rivera-Otero, and Carabali-Diaz were also charged with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1), and false claim of U.S. citizenship, in violation of 18 U.S.C. § 911. Carabali-Diaz was charged with unlawful reentry following removal, in violation of 8 U.S.C. § 1326(a) and (b)(2). The defendants pled guilty to these crimes, and the associated judgments and convictions are not at issue in this appeal.

review is de novo.  *See United States v. Sandlin*, 589 F.3d 749, 758 (5th Cir. 2009).

### 1.  *Legal Principles*

"The due process clause protects defendants against outrageous conduct by law enforcement agents . . . [and] forbids the government to act improperly even against culpable persons."  *United States v. Arteaga*, 807 F.2d 424, 426 (5th Cir. 1986).  "It is well-established in this circuit that a due process violation will be found only in the rarest and most outrageous circumstances." *United States v. Tobias*, 662 F.2d 381, 386 (5th Cir. 1981) (quotation marks omitted).  To violate due process, government conduct must shock the most cynical among us.  *United States v. Yater*, 756 F.2d 1058, 1065 (5th Cir. 1985) (stating that outrageous government conduct must be "shocking to the universal sense of justice"  (quotation marks omitted)); *see also Sandlin*, 589 F.3d at 758 ("The standard for proving outrageous governmental conduct is extremely demanding."); *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997) ("[A] defendant who asserts the defense of outrageous government conduct has an extremely high burden of proof.").  Important to this case, a defendant cannot avail himself of the defense of outrageous government conduct where he has been an *active and willing participant* in the criminal activity that gave rise to his arrest.  *Yater*, 756 F.2d at 1066; *United States v. Posada Carriles*, 541 F.3d 344, 361 (5th Cir. 2008) ("Outrageous conduct will not be found when the defendant is an active, willing participant in the criminal conduct that leads to his arrest." (quotation marks omitted)); *United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003) (requiring a defendant claiming outrageous government conduct to demonstrate "both substantial government involvement in the offense and a passive role by the defendant").

No. 13-20208

## 2. *Discussion*

The evidence here demonstrates that the defendants were willing and active participants in the armed robbery scheme. They initiated a large number of the phone calls and meetings with agent Zayas; they planned the robbery and touted their experience and readiness; they brought firearms and police clothing to the pre-robbery meetings and planning sessions; and they did not express reluctance to proceed.[8]

The government violates a defendant's due process rights if it "instigate[s] the criminal activity, provide[s] the place, equipment, supplies and know-how, and run[s] the entire operation with only meager assistance from the defendants." *Tobias*, 662 F.2d at 386. That did not occur here. Agent Zayas did not provide the guns or police clothing; nor did he provide the idea to use such equipment or any instruction as to how to conduct the robbery. To be sure, agent Zayas created the fictional cover story, but he did not "provide the place, equipment, supplies and know-how" or "run the entire operation." *Id.* To the contrary, he displayed nervousness and inexperience, and he told the defendants that the manner in which they conducted the robbery was up to them. Neither does the record show any evidence of coercion.

Accordingly, we find no error in the district court's decision to deny the defendants' motion to dismiss the indictment based on outrageous government conduct. *Accord Posada Carriles*, 541 F.3d at 361 (finding no outrageous government conduct where the defendant was a willing participant in the criminal conduct); *Tobias*, 662 F.2d at 386-87 (holding that there was no outrageous government conduct where defendant was a "predisposed active

---

[8] Because Zayas's cover story included the "fact" that he never saw money in the stash house, the defendants understood that they would have to sell the cocaine to profit from their robbery. Even given this hurdle, they still proceeded in the attempted robbery, further demonstrating their active involvement.

11

participant, motivated solely by a desire to make money"); *Gutierrez*, 343 F.3d at 422 (holding that there was no outrageous government conduct where defendant provided more than "meager assistance" during the scheme); *Asibor*, 109 F.3d at 1039-40 (finding no outrageous government conduct where government agents supplied drugs to the defendants and then bought them back with government funds, but the defendants were willing participants); *Yater*, 756 F.2d at 1066 (finding no outrageous government conduct where the defendant obtained cocaine "through his own contacts without assistance from the government and transported it himself to the site of the drug sale").

## B.   Confidential Informant's Identity and Testimony

Defendants Carabali-Diaz, Boria, and Lewis argue that the district court erred in denying their motion to compel the testimony or disclose the identity of the CI who introduced agent Zayas (in his undercover role) to the defendants.  We review the district court's decision for an abuse of discretion. *See United States v. Ibarra*, 493 F.3d 526, 531 (5th Cir. 2007).

### 1.   *Legal Principles*

"This Court uses a three factor test to determine whether the identity of an informant should be revealed:  (1) the level of the informant's activity; (2) the helpfulness of the disclosure to the asserted defense; and (3) the Government's interest in nondisclosure."  *Id*.  These factors are commonly referred to as the "*Roviaro* factors" because they are grounded in the Supreme Court's decision in *Roviaro v. United States*, 353 U.S. 53 (1957).

### 2.   *Discussion*

Applying *Roviaro* here, we find no abuse of discretion in the district court's denial of the motion to compel the CI's testimony or disclose his identity.

12

First, the CI was minimally involved. He appeared only once and only to introduce agent Zayas in his undercover role. There is no evidence or allegation that the CI communicated with the defendants after that introduction. Nor is there evidence or allegation that the CI attended subsequent robbery-planning meetings or indicated that he would participate in the robbery. The CI's minimal involvement in the events of this case weighs against disclosing his identity or compelling his testimony. *See United States v. Diaz*, 655 F.2d 580, 588 (5th Cir. 1981) ("When an informant's level of involvement in the criminal activity is that of minimal participation, [the first *Roviaro*] factor by itself will not compel disclosure.").

For similar reasons, the CI's identity and testimony would have been minimally helpful to the defendants' entrapment defense. The CI merely introduced agent Zayas to three people, only one of whom was a defendant. There is no evidence or allegation that the CI procured the statements of the defendants, planned the robbery, obtained the firearms or police equipment, or coerced the defendants' participation in the crimes at issue. As such, the second *Roviaro* factor weighs against disclosing the CI's identity or compelling his testimony. *See United States v. Orozco*, 982 F.2d 152, 155 (5th Cir. 1993) ("The defendant must make a sufficient showing that the testimony would significantly aid the defendant in establishing an asserted defense. . . . Mere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure." (citation and quotation marks omitted)); *United States v. Gonzales*, 606 F.2d 70, 75 (5th Cir. 1979) ("This principle applies with equal force in cases where the defendant relies on an entrapment defense; precedent from this circuit makes it clear that the mere allegation of entrapment is not sufficient in and of itself to force disclosure.").

With the first two *Roviaro* factors weighing so heavily in the government's favor, it is unnecessary to consider the third factor: the

No. 13-20208

government's interest in nondisclosure. *See Diaz*, 655 F.2d at 588-89. Thus, we find no abuse of discretion in the district court's denial of the motion to compel the CI's testimony or disclose his identity.[9]

## C.  Jury Instruction on Entrapment

Defendants Boria and Lewis argue that the district court erred in declining to instruct the jury on the defense of entrapment. Our review is de novo. *See United States v. Stephens*, 717 F.3d 440, 444 (5th Cir. 2013).

### 1.  *Legal Principles*

"To be entitled to an entrapment instruction, a defendant must make a prima facie showing of (1) his lack of predisposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense." *Id.* (quotation marks omitted).[10]

"Predisposition . . . focuses upon whether the defendant was an 'unwary innocent' or, instead, an 'unwary criminal' who readily availed himself of the opportunity to perpetrate the crime." *Id*. at 445 (quotation marks omitted). "[A] defendant's eager willingness to participate in government-solicited criminal activity is sufficient to prove predisposition." *United States v. Reyes*,

---

[9] Defendants Carabali-Diaz, Boria, and Lewis also argue that the district court erred in not holding an evidentiary hearing before denying their motion to disclose the CI's identity. But, neither an *in camera* review nor an "on-the-record" *Roviaro* analysis is required in every instance involving a motion to disclose a CI's identity. *See Diaz*, 655 F.2d at 588 ("We do not think that it was necessary for the district court to interview the informant in camera for we conclude that the informant's testimony could not have been significantly helpful to the appellant's defense."); *see also United States v. Alexander*, 559 F.2d 1339, 1344 (5th Cir. 1977) ("We refuse to adopt a rule requiring a district court to hold an *in camera* hearing whenever the identity of an informant is requested.").

[10] We "consider the record in the light most favorable to the defendant and determine whether there was enough evidence for a reasonable jury to find that the defendant was entrapped." *Stephens*, 717 F.3d at 444.

239 F.3d 722, 741 (5th Cir. 2001).  Evidence that the defendant was an "active, enthusiastic participa[nt]" or that he "demonstrated expertise in the criminal endeavor" is also sufficient to prove predisposition.  *United States v. Nelson*, 732 F.3d 504, 515 (5th Cir. 2013).  "Where a defendant promptly avails himself of a criminal opportunity, it is unlikely that his entrapment defense warrants a jury instruction."  *Stephens*, 717 F.3d at 445 (quotation marks omitted).

"Government inducement consists of the creative activity of law enforcement officials in spurring an individual to crime" and includes "either threatening or harassing conduct or actions designed specifically to take advantage of the defendant's weaknesses."  *Gutierrez*, 343 F.3d at 420 (internal quotation marks omitted).  "It is well settled that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution."  *Jacobson v. United States*, 503 U.S. 540, 548 (1992) ("Artifice and stratagem may be employed to catch those engaged in criminal enterprises.").

### 2.  *Discussion*

Viewing the evidence in the defendants' favor, they failed to present a prima facie case of entrapment.  With respect to predisposition, the evidence shows that the defendants, save Lewis, were willing and active participants who touted their experience and expertise.  For example, the defendants planned the robbery, obtained guns, and procured police clothing.  And, they returned to commit the robbery after the initial robbery attempt was scratched when several cohorts failed to arrive on time.  The evidence shows that the defendants did not hesitate.  To the contrary, the evidence shows that they "promptly avail[ed] [themselves] of the opportunity to carry out an armed robbery once the plot was presented."  *Stephens*, 717 F.3d at 445.  The defendants' independent behavior, unlinked to agent Zayas, is further evidence

of their predisposition to complete the crimes at issue here. *See United States v. Brace*, 145 F.3d 247, 262 (5th Cir. 1998) ("[E]vidence of the defendant's ready response to the solicitation, as well as evidence of independently motivated behavior that occurs after government solicitation begins, can be used to prove that the defendant was predisposed, i.e., ready and willing to commit the crime even before he was contacted by the government." (emphases omitted)). Given these facts, no reasonable jury could believe that Boria was not predisposed to commit the crimes at issue. Thus, no reasonable jury could find that he was entrapped, and accordingly, the district court did not err in declining to instruct the jury on an entrapment defense.[11]

The facts regarding Lewis's participation in the armed robbery presents a different case because there is some evidence from which a jury could find a lack of predisposition. However, given the evidence, no reasonable jury could find that Lewis was induced to commit the crimes at issue. First, the government's use of a reverse-sting operation does not itself constitute inducement. *Gutierrez*, 343 F.3d at 420. Moreover, there is no evidence that Agent Zayas appealed to Lewis's sense of compassion. *See, e.g.*, *Sherman v. United States*, 356 U.S. 369 (1958) (holding that there was sufficient evidence of inducement when the government exploited a defendant's sympathy). Nor is there evidence that Zayas repeatedly attempted to convince Lewis to join in the face of Lewis's refusals. *See, e.g.*, *United States v. Bradfield*, 113 F.3d 515 (5th Cir. 1997) (finding sufficient evidence of inducement where the

---

[11] Boria also failed to make a prima facie showing of inducement. *Gutierrez*, 343 F.3d at 420 ("Simply because the chain of events leading to the defendant's arrest originated with the government does not entitle a defendant to an entrapment instruction. It is proper (i.e., not an 'inducement') for the government to use a 'sting,' at least where it amounts to providing a defendant with an 'opportunity' to commit a crime." (quotation marks omitted)). There is no indication that agent Zayas or any other government agent coerced, harassed, or made repeated overtures to Boria or any of the other defendants.

government persisted in the face of a defendant's resistance by making "innumerable telephone calls to [the defendant] to entice him to do a drug deal"). To the contrary, Agent Zayas merely offered Lewis a share of a large quantity of drugs, and Lewis agreed shortly thereafter. Nothing prevented Lewis from simply walking away or otherwise declining Agent Zayas's invitation to join in the conspiracy. Lewis's only evidence of inducement was a one-time offer of a share in the spoils of an armed robbery of a stash house that held at least thirty kilograms of cocaine. A straightforward offer to enjoy the spoils of a crime does not, standing alone, "create[] a substantial risk that an offense would be committed by a person other than one ready to commit it." *See id.* at 521. Given these facts, no reasonable jury could believe that Lewis was induced to commit the crimes at issue, and thus, the district court did not err in declining to instruct the jury on an entrapment defense. *Accord United States v. Theagene*, 565 F.3d 911, 923 (5th Cir. 2009) (finding sufficient evidence of inducement where the defendant was convinced to commit a crime in the space of a single conversation and the government appealed solely to the defendant's interest in financial gain, not empathy or compassion).

### D.  Constructive Amendment of the Indictment

Count 2 charged that the defendants, "aiding, abetting, and assisting others . . . , did knowingly and intentionally attempt to possess with intent to distribute a controlled substance, that is, five (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine . . . ." When instructing the jury, the district court quoted Count 2, including its "attempt" and "cocaine" language. The court then stated that, to establish the first element of the offense, the government had to prove beyond a reasonable doubt "[t]hat the offense of possession with intent to distribute a controlled substance

17

was committed by some person."  No defendant objected to the instruction regarding Count 2.

Defendants Boria and Lewis now argue that the indictment was constructively amended at trial because the jury instruction's description of the first element of Count 2 omitted the word "attempt" and failed to specify that the controlled substance at issue was cocaine.  Where a defendant fails contemporaneously to object, this Court reviews a constructive-amendment claim for plain error.  *United States v. Isgar*, 739 F.3d 829, 840 (5th Cir.), *cert. denied*, 135 S. Ct. 123 (2014).[12]  This Court will reverse for plain error if (1) there is an error or deviation from an established legal rule; (2) the error is clear or obvious and not subject to reasonable dispute; (3) the error affected the defendant's substantial rights; and (4) if the first three requirements are satisfied, this Court determines, in its sound discretion, that the error should be remedied to avoid "seriously affect[ing] the fairness, integrity or public reputation of judicial proceedings."  *United States v. Escalante-Reyes*, 689 F.3d 415, 419 (5th Cir. 2012) (en banc).

### 1.  Legal Principles

"The Fifth Amendment guarantees that a criminal defendant will be tried only on charges alleged in a grand jury indictment."  *Isgar*, 739 F.3d at 840.  "A jury instruction constructively amends an indictment if it permits the jury to convict the defendant upon a factual basis that effectively modifies an essential element of the crime charged."  *Id.*  In reviewing a jury charge

---

[12] Lewis argues that a constructive amendment is a reversible error *per se* if there has been a modification of the elements of the crime charged.  That is not the law of this Circuit.  *See United States v. Daniels*, 252 F.3d 411, 414 (5th Cir. 2001) ("It is now clear that this circuit applies plain error review to forfeited constructive amendment arguments."); *United States v. Bohuchot*, 625 F.3d 892, 897 (5th Cir. 2010) ("[P]lain error review applies even if there has been a constructive amendment.").

purportedly amended by an indictment, this Court begins by considering "whether the jury instruction, taken as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them." *United States v. Scher*, 601 F.3d 408, 411 (5th Cir. 2010) (citation and quotation marks omitted). This Court "scrutinize[s] any difference between an indictment and a jury instruction and will reverse only if that difference allows the defendant to be convicted of a separate crime from the one for which he was indicted." *Id.* (citation and quotation marks omitted).

Defendants Boria and Lewis argue that the district court's omission of the word "attempt" when explaining the first element of the offense allowed the jury to convict them of a crime for which they were not indicted—that is, the *completed* crime of possession of cocaine with the intent to distribute it (rather than the *attempted* crime). Defendants Boria and Lewis also argue that the omission of the word "cocaine" allowed the jury to convict them based on "an intent to distribute heroin, methamphetamine or any other controlled substance . . . ."

### 2. *Discussion*

Boria and Lewis skip over the fact that the district court directly quoted Count 2, including its "attempt" and "cocaine" language. This informed the jury that the defendants were charged with aiding and abetting the attempted possession of cocaine with the intent to distribute it. More importantly, there was ample evidence that the defendants aided and abetted each other in the attempted possession of cocaine with the intent to distribute it: They discussed the robbery plan in detail and ultimately gathered with the expectation of proceeding to the stash house to steal cocaine at gunpoint; they dressed in police clothing; they brought guns and tie wraps to subdue and restrain their

victims; and they made plans to split the expected windfall from their armed robbery.    Given the strength of this evidence, it is clear that the third prerequisite for granting relief for plain error is not satisfied; the omission of the words "attempt" and "cocaine" from one portion of the jury instruction did not affect the defendants' substantial rights.  *See United States v. Bohuchot*, 625 F.3d 892, 899-900 (5th Cir. 2010) (concluding that the jury charges constructively amended the indictment but holding that the error did not affect the defendants' substantial rights or the fairness of the proceedings because the evidence against the defendants was "strong").  The indictment, which was read verbatim to the jury, charged the defendants with aiding and abetting the attempted possession of cocaine with the intent to distribute it, and the strength of the evidence was more than sufficient to prove that offense. Because the third prerequisite for granting relief for plain error is not satisfied, we find no plain error here.[13]

## E.   Sufficiency of the Evidence

Defendant Rodriguez argues that his conspiracy convictions represent a manifest miscarriage of justice because the record is devoid of evidence establishing his guilt, especially given that he did not know about the robbery plan until late in the conspiracy period.  Because Rodriguez did not move for a judgment of acquittal at the close of all the evidence, we review his sufficiency-of-the-evidence challenge for a "manifest miscarriage of justice," which is a "very narrow" standard. *United States v. Salazar*, 542 F.3d 139, 142, 144 (5th Cir. 2008).  To prevail, Rodriguez "must show either that the record is devoid

---

[13] Boria and Lewis assert that, if their constructive-amendment argument with respect to Count 2 prevails, we must necessarily find constructive amendment for Count 4. The opposite is true here.  Because we find no plain error with respect to the jury instruction on Count 2, we necessarily find no plain error with respect to the jury instruction on Count 4.

No. 13-20208

of evidence of guilt or that the evidence is so tenuous that a conviction is shocking." *Id.* (quotation marks omitted).[14]

The evidence was more than sufficient to support Rodriguez's conspiracy convictions. Rodriguez was at Boria's apartment on December 2 when the defendants discussed the robbery before their subsequent meeting with agent Zayas. Rodriguez also went to the pre-robbery gathering, dressed in police clothing. At that robbery-planning meeting, he appeared knowledgeable about the plan and prepared to proceed, and he never expressed a desire to withdraw from the conspiracy.

When the defendants were arrested on December 2, Rodriguez attempted to flee but was taken down by a police canine. While fleeing, he dropped a police shirt. After his arrest, agents found police clothing and a revolver where Rodriguez had been sitting in the back of one of the getaway vehicles.

Even assuming that Rodriguez did not join the criminal plan until December 2, his late arrival does not absolve him of guilt. *See United States v. Blackthorne*, 378 F.3d 449, 454 (5th Cir. 2004) ("It is of no consequence that [the defendant] might have joined the conspiracy after the point at which some overt acts occurred, because one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of conspirators, made after the formation and in furtherance of the conspiracy." (quotation marks omitted)); *United States v. Bates*, 600 F.2d 505, 509 (5th Cir. 1979) (noting that late entry into conspiracy does not preclude conviction as a participant). Rodriguez clearly joined the conspiracy before the armed robbery was expected to occur

---

[14] We review the evidence "in the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices." *Salazar*, 542 F.3d at 143 (quotation marks omitted).

No. 13-20208

and to facilitate the robbery.  He is, therefore, liable as a full participant in the operation, and there is sufficient evidence to support his convictions.

## F.  Sentencing Error

### 1.  *Procedural Reasonableness*

Defendant Rivera-Otero argues that his sentence is procedurally unreasonable because the district court failed to adequately explain the sentence.[15]    Because Rivera-Otero did not object to the procedural reasonableness of his sentence in the district court, we review his sentence for plain error.  *See United States v. Dominguez–Alvarado*, 695 F.3d 324, 327-28 (5th Cir. 2012).

We find no procedural error in the district court's consideration or explanation of the sentence chosen.  To the contrary, the record reflects that the district court listened to several arguments from Rivera-Otero's counsel, considered the § 3553(a) factors, and then provided a thorough explanation of facts it considered relevant to determining Rivera-Otero's sentence.  In particular, the district court made the following findings related to the crimes at issue on appeal:  Rivera-Otero "arrange[d] and participate[d] in a scheme to conduct an armed robbery of a stash house," which he believed contained thirty kilograms of cocaine.  Four firearms were brought to the robbery by Rivera-Otero and his cohorts.  Rivera-Otero played a managerial role in the offense because he recruited defendant Lewis into the conspiracy.  He also "attempted to impersonate a police officer and was dressed in police clothing at the time of

---

[15] *Cf. Gall v. United States*, 552 U.S. 38, 51 (2007) (providing examples of "significant procedural error," including "failing to consider the § 3553(a) factors" and "failing to adequately explain the chosen sentence").

his arrest." And, he and his co-conspirators "intended to physically restrain their victims."[16]

The district court made these additional findings related to Rivera-Otero's background: Rivera-Otero was an illegal alien who had purchased the identity of a deceased U.S. citizen. At the time of his arrest, he possessed "a fraudulent Texas identification card, a fraudulent Social Security card, [two] fraudulent . . . debit card[s]." He had used so many aliases "to allude law enforcement and further his criminal activity" that his "true identity remain[ed] unknown." Rivera-Otero committed the instant offenses less than nine months after being released from custody from a prior drug offense wherein he was convicted of conspiracy to distribute and possession with intent to distribute five or more kilograms of cocaine and sentenced to more than six years in prison.

Before pronouncing the sentence, the district court noted that Rivera-Otero "continues to show a disregard for the laws of the United States by engaging in similar criminal activity." The district court also noted that some "egregious conduct was not taken into account in the guidelines calculation," namely, the use of police clothing, the impersonation of a law enforcement officer, and the intent to restrain victims during the armed robbery. Rather than capturing this conduct through an upward departure from the guidelines range, the district court stated that "a sentence at the high end of the guideline range, plus the mandatory consecutive terms [for the counts to which Rivera-Otero pled guilty], will adequately capture the likelihood of recidivism and address [Rivera-Otero's] background, characteristics, and promote the respect

---

[16] The district court agreed with the government that the evidence showed that Rivera-Otero recruited Lewis to join the conspiracy. The court also agreed with the government that the guidelines calculation should be based upon the amount of drugs believed to be in the stash house. After making these findings in open court, the district court adopted the presentence report in all relevant respects.

No. 13-20208

for the law and safeguard the public as outlined in . . . § 3553(a)." The district court then imposed a high-end, within-guidelines sentence.

Given this thorough explanation of the district court's chosen sentence, we find no procedural error and certainly no plain error.

### 2. *Substantive Reasonableness*

Rivera-Otero also argues that his sentence is substantively unreasonable and that a downward departure is warranted because (1) the facts of agent Zayas's cover story "were completely fabricated by government agents" and (2) any within-guidelines sentence based on the fictitious cover story is "greater than necessary" to fulfill the purposes of sentencing. We review the substantive reasonableness of a sentence for an abuse of discretion. *United States v. Diehl*, 775 F.3d 714, 724 (5th Cir. 2015). "Our review for substantive reasonableness is 'highly deferential,' because the sentencing court is in a better position to find facts and judge their import under the § 3553(a) factors with respect to a particular defendant." *Id.* "Where a sentence falls within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness." *United States v. Aldawsari*, 740 F.3d 1015, 1020 (5th Cir.), *cert. denied*, 135 S. Ct. 160 (2014).

In the specific circumstances of this case, the overall sentence is well-supported by the facts and by the district court's consideration and explanation of the § 3553(a) sentencing factors. It is clear that the district court sentenced Rivera-Otero with reference to the applicable guidelines range, the seriousness of the crimes, and Rivera-Otero's background and criminal history. Given the district court's extensive consideration and explanation of the appropriate sentence in the light of the § 3553(a) sentencing factors, we cannot conclude that the district court abused its discretion in imposing the sentence it did.

No. 13-20208

Rivera-Otero argues that the district court erred when it declined his invitation to depart from the sentencing guidelines and impose a below-guidelines sentence.  However, because Rivera-Otero has not alleged that the district court mistakenly believed that it lacked authority to depart downward, this Court lacks jurisdiction to hear Rivera-Otero's downward-departure argument.  *See United States v. Tuma,* 738 F.3d 681, 691 (5th Cir. 2013) ("We lack jurisdiction to review the denial of a downward departure unless the district court's denial resulted from a mistaken belief that the Guidelines do not give it authority to depart."); *United States v. Sam,* 467 F.3d 857, 861 (5th Cir. 2006) ("This court lacks jurisdiction to review a downward-departure denial unless, as here, the district court held a mistaken belief that the Guidelines do not give it the authority to depart."); *United States v. Barrera-Saucedo,* 385 F.3d 533, 535 (5th Cir. 2004) ("This Court has jurisdiction to review a district court's refusal to grant a downward departure from the Guidelines only if the refusal was based on an error of law.  Thus, this Court may review the district court's decision only if it refused a downward departure on the mistaken conclusion that the Guidelines do not permit such a departure." (citations omitted)); *United States v. Cooper,* 274 F.3d 230, 248 (5th Cir. 2001)

Moreover, his suggestion that the government engaged in "sentencing entrapment," or "sentencing factor manipulation," when it created a cover story involving thirty to forty kilograms of cocaine rather than some lesser amount is undermined by a long line of precedent from this Circuit; this is especially the case where, as here, there was no entrapment and no outrageous government conduct.  *See United States v. Burke,* 431 F.3d 883, 886 (5th Cir. 2005) ("We hold that a sentence for drug conspiracy may be based on fake drugs."); *id.* at 887 ("[I]n convictions based on reverse-sting operations such as this one, where the actual quantity of drugs is controlled by the government

instead of by the defendant, the quantity of drugs agreed upon more accurately reflects the scale of the offense than the quantity actually delivered. . . . [The defendant's] sentence for drug conspiracy is properly based upon the amount he agreed to escort.  His crime was complete when he agreed to aid in the distribution of 350 kilograms of cocaine with the intent to achieve that objective."); *see also United States v. Stephens*, 717 F.3d 440, 446 (5th Cir. 2013) ("We have never recognized sentencing entrapment as a defense, and we have consistently noted that, were we to accept it, it would only be cognizable in cases involving "true entrapment," or "overbearing and outrageous conduct" on the part of the Government." (citations omitted)); *id.* at 447 ("[S]ince the Government's conduct amounted to nothing more than passive encouragement, and since there is no evidence that [the defendant] resisted the [opportunity to engage in illegal behavior], we hold that [the defendant] would not be entitled to a sentencing entrapment defense even were it available in this circuit."); *United States v. Tremelling*, 43 F.3d 148, 151-52 (5th Cir. 1995) (holding that the Government's bringing quantities of drugs to a controlled buy in excess of a previously agreed-upon amount could not amount to sentencing entrapment where the defendant did not resist taking on the additional drugs).  In fact, this Court has affirmatively rejected a previous attempt to minimize the severity of a criminal offense through the suggestion that there were no actual victims and no possibility of completing the desired crime.  *See Stephens*, 717 F.3d at 447 ("While [the defendant] attempts to minimize the severity of his offenses by noting that the offense conduct did not result in harm to any actual victims and that [he] was led along by his co-conspirators and law enforcement agents, we fail to see how such arguments can overcome the presumption of reasonableness [in the sentence imposed], given that [the defendant] was arrested while proceeding to a location at which he fully expected to participate in a potentially highly-dangerous armed

robbery of an armored truck."); *see also United States v. Richardson*, 925 F.2d 112, 117-18 (5th Cir. 1991) (holding that there was no separation of powers problem in allowing the government to dictate the amount of money involved in an undercover laundering sting and that there was no due process violation because the defendant "freely decided to accept the negotiated amount").

Thus, Rivera-Otero has not shown that the district court's failure to impose a more lenient sentence rendered his sentence unreasonable. He has not alleged any facts showing that he was persuaded to commit a greater offense than he otherwise was predisposed to commit or that the government agents' conduct was overbearing or outrageous. Nor has he alleged any basis upon which his involvement in attempting to steal thirty or more kilograms of cocaine—through armed force, physical restraint, and the impersonation of law enforcement officers—was conduct that the district court improperly considered in determining his sentence. We simply cannot conclude that the district court abused its discretion in imposing the sentence it did.

### III. Conclusion

For the foregoing reasons, we AFFIRM the defendants' convictions and sentences in all respects.